JEAN B. BOULICAULT et al. v. ORIEL GLASS COMPANY et al.; LOUIS T. MAGUIRE, Appellant.

### In Banc, June 19, 1920.

1. **MONEY JUDGMENT: Equitable Proceeding.** In an equity suit brought by a majority of the stockholders of a corporation against it and its president to recover from him money embezzled by its bookkeeper, a money judgment may be rendered against the president in favor of the company. [Distinguishing State ex rel. v. Foster, 225 Mo. 171.]

2. **EVIDENCE: Motion to Strike Out.** If the answer is responsive to the question, a motion to strike it out, no objection having been previously made, comes too late.

3. ———: **Removal of President of Corporation.** A statement by the court that he could not select officers for the corporation and that if the president were removed the directors would have to choose his successor is a sufficient answer to a complaint that the court did not permit an examination of the plaintiff directors concerning their capacity to act as president.

4. **LACHES: Stockholder.** A stockholder of a corporation, who is not a director, is under no obligation to examine the company's books for the purpose of ascertaining whether its bookkeeper has been embezzling its funds, and is not chargeable with laches in not discovering the fact sooner, but has the right to rely upon the directors and officers to conduct its business properly.

5. ———: **Director: Neglect of Duty.** Where the president is manager and treasurer and in charge of the finances of a corporation and its principal stockholder, whether another director, who was simply superintendent of the manufacturing plant, was guilty of laches in not discovering the embezzlement of a bookkeeper which had gone on through a series of years, depends on whether he

neglected a duty the performance of which would have led to discovery or knowledge; and in this case it is *held* that he is not chargeable with neglect of duty.

6. **CORPORATION: Duty of Directors: Ordinary Care.** For failure to perform their duties as such, directors of a corporation become liable for corporate losses resulting therefrom. They are required to exercise the care that ordinarily prudent and diligent men would exercise under similar circumstances; but in determining the amount of care they should exercise, the restrictions of the statute and the usages of the business should be taken into account.

7. ———: ———: **Different Degrees of Care: Salary.** The fact that some directors serve without compensation and others are paid for their assumed duties is to be taken into consideration in determining whether they have exercised a proper care and watchfulness over the company's finances. A higher degree of vigilance is required of the president of the company who is its treasurer and manager and undertakes the oversight of its business and its finances and receives an adequate salary, to discover the monthly embezzlements of its bookkeeper through a series of years, than is imposed upon an uncompensated director whose duties with respect to the finances arise solely from the fact that he is a director.

8. ———: ———: ———: **Other Considerations: Neglect of Duty: Laches.** Likewise the confidence that all the directors had in the bookkeeper, the fact that no suspicion was directed against him at any time during the many years he was embezzling its moneys, the continued great prosperity of the company, and the fact that it was not customary to have the books of a concern of its size examined by public accountants, are all matters to be considered in explanation of the failure of a director, who was a mere superintendent of the manufacturing plant and had no knowledge of books or accounting, to examine the books and discover the losses; and the further fact that he knew that the president, who was also treasurer and business manager, had himself kept the books for three years, had then secured the bookkeeper whom he had known from boyhood, for fifteen years was in the office where the books were kept, had been assigned and paid to perform the special duty of caring for the finances of the company and made the custodian of its funds, and had presented an annual statement to the directors, should likewise be considered in determining whether said superintendent, as a director, exercised the care that an ordinary prudent and diligent man would have exercised under the circumstances; and when all these facts are considered, it is held that he did, and that he did not neglect any duty which would have brought him knowledge of the bookkeeper's peculations.

9. ———: **Treasurer: Neglect of Duty: Liability for Bookkeeper's Peculations.** The treasurer of a corporation, who was also its president and the manager of its finances, who signed checks on the company's account, with blanks for the amounts unfilled and never compared the returned checks with the check-book stubs, and did not discover or attempt to discover that the aggregate of the returned checks exceeded the amount of the approved accounts, though the total did exceed that amount each month for years—a practice known only to himself and the bookkeeper, who filled in the amounts in the blank checks—was guilty of neglect of duty, and is liable to the company for the amount of the resultant losses.

Appeal from St. Louis City Circuit Court.—Hon. *Glendy B. Arnold,* Judge.

AFFIRMED.

*Jourdan, Rassieur & Pierce* for appellant.

(1) This suit, being one in equity, is practically triable *de novo* on appeal. That the law and facts are alike subject to review on appeal in equity is settled law of Missouri. Barrett v. Davis, 104 Mo. 549; Lins v. Lenhardt, 127 Mo. 271; Robertson v. Shepherd, 165 Mo. 360. (2) In an equitable proceeding, such as this, the court has no power to enter a money judgment against a defendant. State ex rel. v. Foster, 225 Mo. 171. (3) Plaintiffs should be denied relief because they have been guilty of laches and for a long period of time have acquiesced in the conduct of Louis T. Maguire, which they now claim was wrongful and negligent. 3 Cook on Corporations, p. 2602, secs. 728, 729; 10 Cycl. on Corporations, p. 971; Loomis v. Mo. Pac. Ry. Co., 165 Mo. 469; 3 Clark & Marshall on Corporations, p. 2286, sec. 755-F; Klein v. Brewing Assn., 231 Ill. 594; Burt v. British Life Assn., 45 Eng. Rep. 62, 4 DeG. & J. 158. (4) Under the law the duty of controlling and managing the property and business of a corporation rests on its directors collectively and not upon any particular officer. Sec. 3347, R. S. 1909; Sec. 1320, R. S. 1899; Sec. 2772, R. S.

1889. It therefore avails plaintiffs nothing to say that they did not have actual knowledge that Louis T. Maguire was not auditing or checking up the accounts of the bookkeeper. Hax v. Davis Mill Co., 39 Mo. App. 458; 3 Clark & Marshall on Corporations, sec. 752; 10 Cycl. on Corporations, p. 832, sec. 8. (5) The trial court erred in its rulings on questions of evidence. (a) To permit the plaintiff to state that the bookeeper worked under the sole supervision of defendant was erroneously allowing him to state his own conclusion. Gutridge v. Mo. Pac. Ry. Co., 94 Mo. 472; Boettger v. Scherpe & Koken Co., 136 Mo. 531, 536. (b) In view of plaintiff's efforts to have Louis T. Maguire removed as a director and officer of the company, it was error to prevent an inquiry by defendants as to who would, in case of his removal, make a suitable president for the company in his place. (c) And it was also error to prevent an inquiry as to the qualifications of plaintiffs to conduct the business of the company. (d) The court also erred in permitting Witness Mare, over defendants' objection and exception, to give his own experience as to what other corporations did with reference to auditing their books, rather than show what the custom in that regard was. (6) In determining whether defendant was negligent the matter must be viewed in the light of all the circumstances of this particular case as they existed before the shortage was discovered and not in the light of subsequent events, and when so viewed it will appear that he has not been guilty of negligence. Bailey v. Babcock, 241 Fed. 514; In re Spering's Appeal, 71 Pa. St. 11, 10 Am. Rep. 684; Fletcher's Cyclopedia on Corporations, sec. 2443, p. 3694.

Phillips W. Moss for respondents.

(1) There never has been any want of power in a Court of Chancery to render a money judgment on an accounting. Holland v. Anderson, 38, Mo. 55; Potter v. Whitten, 161 Mo. App. 129; Powell v. Powell,

217 Mo. 585; Gill v. Eli-Morris Safe Co., 156 S. W. 811. (2) Where a court of equity has acquired jurisdiction of a cause for one purpose, it will proceed to do complete justice between the parties, and determine all matters in issue, even if this involves adjudicating matters of law. Waddle v. Frazier, 254 Mo. 403; Hogan v. Bank, 182 Mo. 345. (3) This suit was properly brought and the petition states a cause of action. Slattery v. Transportation Co., 91 Mo. 217; Pomeroy on Equity Jurisprudence, sec. 1095; 3 Cook on Corporations (7 Ed.), sec. 701, p. 2367. (4) The question of what is actionable negligence on the part of an officer and director of a corporation depends upon the facts and circumstances of each particular case. State v. Rottmann, 183 Mo. 552; Trustees v. Bosseiux, 3 Fed. 817; 10 Cycl. on Corporations, page 971; 3 Clark & Marshall on Corporations, sec. 755-F. (5) An officer of a corporation is personally liable for losses to a corporation occurring through his gross negligence. Marshall v. Bank, 85 Va. 676; McEwen v. Kelly, 140 Ga. 720; Ham v. Cary, 82 N. Y. 65; Rubber Co. v. Benedict, 164 N. Y. App. Div. 332, 338; Camden v. Virginia Safe Deposit & Trust Corp., 78 S. E. 596, 598; Fidelity & Deposit Co. v. Wiseman, 124 S. W. 621; 2 Thompson on Corporations, sec. 1268; Morawetz on Private Corporations, sec. 552; Kelly v. Farney, 145 Ill. App. 80.

BLAIR, J.—This is a suit by minority stockholders of the Oriel Glass Company to recover from Louis T. Maguire the amount of certain sums embezzled from the company by a bookkeeper. It is allaged the losses resulted from the negligence of Maguire, who was for many years president, manager and treasurer of the company. Judgment went in favor of the company for such sums as had been taken within five years prior to the bringing of the suit. Since this appeal was taken Louis T. Maguire has died and the cause has been revived in the name of his executors.

Jean B. Boulicault learned the business of glass manufacturing in his youth, in his native land. He came to America from France when he was about twenty-two years old. His brother, Leon C., was a blacksmith and came to America about 1884. In 1889 Jean B. determined to establish in St. Louis a plant for the manufacture of bent glass. Search for a location brought him into contact with William A. Maguire, who suggested a partnership in the glass business. Eventually this suggestion was accepted, and William A. Maguire, Louis T. Maguire and Jean B. Boulicault began manufacturing glass. Each owned a one-third interest. The Maguires furnished the capital and Boulicault the technical knowledge and experience. Louis T. Maguire looked after the business and finances of the partnership, and Boulicault took charge of the work of manufacturing. In 1891 Leon C. Boulicault began working in the plant with his brother. The business prospered from the first. Until 1892 Louis T. Maguire kept the books of the partnership. In that year a corporation was formed with a capital stock of $20,000, divided into 200 shares. Of these Louis T. Maguire, William Maguire and Jean B. Boulicault took 60 shares each and Leon C. Boulicault 20 shares. Louis T. Maguire then procured a bookkeeper, whom he had known from youth and with whom he had worked for the Haydock Carriage Company for some years, to keep books for the new corporation. Louis T. Maguire, William A. Maguire and Jean B. Boulicault were elected directors. Appellant was secretary, treasurer and manager. William A. Maguire was president and Jean B. Boulicault was vice-president and superintendent of the manufacturing plant. In 1895 William A. Maguire sold 41 shares of stock to Louis T. Maguire and 19 shares to Chas. J. Maguire. Thenceforward the directors have been Louis T. Maguire, Chas. J. Maguire and Jean B. Boulicault; Louis T. Maguire has been president, treasurer and manager; Charles J. Maguire has been secretary, and Jean B.

Boulicault v. Oriel Glass Co.

Boulicault has been vice-president and superintendent of the actual work of manufacturing. Leon C. Boulicault has assisted his brother in the plant. When the partnership was formed it was agreed that Louis T. Maguire should "handle the soliciting and sales end and the financial end of this business," and Jean B. Boulicault was to superintend the manufacture of glass. This division of duties and responsibilities continued until this suit was brought. The business office of the company was kept down town and at a considerable distance from the plant. There Louis T. Maguire had his headquarters, and there the books of the company were kept. In 1908 Louis T. Maguire lost the use of his lower limbs, and thereafter he seldom visited the office or the plant, but retained his official position and transacted the business of the company mainly from his residence. He kept in touch with the office by occasional trips thereto and by telephone and through his son Francis, then employed by the company. Most of the company's business was transacted by mail. As treasurer of the company Louis T. Maguire drew the checks on the company's bank account. In March, 1915, he "looked over the check book" and found some discrepancies. He called for the cash book and found others. He then asked the bookkeeper for a trial balance. When this was furnished Maguire pointed out the discrepancies he had found. The bookkeeper said it must be a mistake. Maguire told him that "it occurred pretty often" to be a mistake, and said he would get an accountant to go over he books. That night the bookkeeper committed suicide.

The man's reputation had been good. His habits were apparently economical, and no one, in or out of the company, had felt any suspicion of him, so far as the record shows. An accountant was employed and the books and affairs of the company were examined. It was discovered that the bookkeeper commenced in 1892 to abstract the company's funds. From that time forward until his death every month showed an embezzle-

ment of some amount. The total shortage for the twenty-three years was $87,345.69. The whole of this sum was taken from the bank account of the company. The bookkeeper was not authorized to draw checks on this account, and drew none. Neither did he forge Maguire's name. His opportunities came from the custom of Maguire, the treasurer, to draw and sign checks, usually payable to the bookkeeper, in which the amounts to be withdrawn were left in blank. No reports of the amounts filled in by the bookkeeper were required by Maguire. The pass book was infrequently balanced by the bank. It was allowed by Maguire to run from two to six months. At no time did Maguire compare the canceled checks and their aggregate with the check book stubs and their aggregate, nor did he ever compare any of them with the cash book of the company. He seems to have kept no account or record of either the bills or total of the bills he approved for payment. An examination of the pass books, check stubs and such checks as were available disclosed the method employed by the bookkeeper to get at the company's money in bank. Comparison of the aggregate amount shown by the check stubs for illustrative periods with the aggregate of checks returned by the bank for the same periods, disclosed that the latter exceeded the former by the sums embezzled during that time. The pay roll checks and checks to cash were all missing. The checks covering other items of disbursement correctly corresponded with the amounts of such items as shown by the books of the company. Pay-roll checks were drawn frequently, probably each week. A verification of the pay-roll books for the year 1905 and thereafter until the exposure came, discloses that the amounts shown by the check stubs and cash book to have been disbursed on account of pay rolls, corresponded exactly with the amounts properly due for pay-roll disbursements as shown by the pay-roll books. These facts compel the conclusion the accountants reached that the bookkeeper obtained the money from the company's bank account by filling in the blanks

left for amounts in the pay-roll checks and checks "to cash" with sums in excess of the correct amounts of pay roll and cash disbursements and, to the same extent, in excess of the sums written in the check stubs. This excess, thus withdrawn from the bank account, was the amount retained and embezzled by the bookkeeper.

So far as this record and the contentions of the parties go, the books of the company show correctly every item of receipts and disbursements. To keep his books in apparent correspondence with the constantly reduced bank balance, two different plans were used. From June, 1892, until July, 1893, the disbursement side of the cash book was made, by forced footings, to show amounts in excess of actual expenditures. From July, 1893, until the exposure occurred, the bookkeeper followed the plan of decreasing the amount of the additions in the cash receipt side of the cash book. The items of receipts were correctly entered, but an amount equal to the sum taken would be dropped from the footing. To illustrate, in February, 1912, the total brought forward to page 20 on February 15, was $6906.95. Thirty-eight items of receipts appear on this page. These aggregate $415.34. The footing appears as $6997.29. The correct footing would have been $7322.29, which is a discrepancy of $325. In the cash book for 1914 the amount brought forward on September 24th, to page 390 is $9615.83. Thirty-one items of receipts appear on this page and the footing appears as $9448.54, which is $167.28 *less* than the amount at the *top* of the column. The total receipts shown on this page aggregate $532.72. The forced footing was, therefore, $700 less than the correct footing. There were numerous instances of this kind, according to the testimony of an accountant. These false entries in the cash book required corresponding reductions in debits on the ledger. This was accomplished by increasing the debit side of the sales account, called by the witnesses the "bending account." In this account appeared the gross sales on the credit side and the allowances to customers for reductions, offsets, etc., on the

debit side. The account for 1914 illustrates this method. All claims, etc., debitable for 1914 appeared on three pages and consisted of numerous small items. The items on the first page (134)• aggregate $201.04. These were correctly footed on page 134, but the amount carried forward to page 135 was $6201.04. The debit side of the bending account was thus forced $6000, and this sum corresponds with the shortage for the entire year. Pages 135 and 136 show no other discrepancies. The total allowances debitable for the year were $913.21. The amount shown in the final footing was $6913.21. This illustrates the method habitually pursued in the ledger account.

The books of the company were never examined by an accountant until after the bookkeeper's death in March, 1915. Jean B. Boulicault testified he frequently requested that this be done, but that Louis T. Maguire would not consent to it. Maguire said, in substance, that it was expensive and unnecessary; asked Boulicault if he was not satisfied with the money he was getting. Boulicault also testified Maguire, in 1899, threatened to sell his stock to some big company which would "squeeze" out Boulicault if he continued to insist upon an examination. Leon C. Boulicault testified he asked Maguire to have the books examined and was told that he, Maguire, would look after that. Maguire denies all this. On one occasion Charles J. Maguire, in a director's meeting, moved that an accountant be employed. There was no formal second to the motion. Jean B. Boulicault said it "ought to be done." Louis T. Maguire did not put the motion. Louis T. Maguire admitted he kept the books of the partnership from its formation in 1889 until the organization of the corporation in 1892, but testified he knew little or nothing about books and couldn't understand them; said this was especially true of the ledger. It is reasonably clear neither of respondents had any knowledge of bookkeeping. The defaulting bookkeeper was on friendly terms with all concerned and no suspicion of his honesty was

felt by any of them. Annually a statement of the company's financial condition was submitted to the board of directors. The company was properous, and until 1913 or 1914 its net earnings were such that the company paid liberal dividends, sometimes fifty per cent on the stock. This, in spite of the average annual loss of $4000 through the embezzlements referred to.

It does not appear that the correctness of these statements was ever questioned. There was evidence *pro* and *con* on the question whether corporations like the one here involved customarily had their books examined by accountants.

I. Appellant contends that "in an equitable proceeding such as this, the court had no power to enter a money judgment" against Louis T. Maguire. In support of this the case of State ex rel v. Foster, 225 Mo. 171, is cited. In that case the trial court had attempted to dissolve a corporation, appoint a receiver and render judgment in the receiver's favor against individual defendants at one and the same time. The fact that the judgment was in favor of a receiver not then in existence, as such, and was not in favor of the corporation, was the ground of decision on the point to which the case is cited here. In the instant case the judgment is rendered in favor of the corporation. This accords with the holding in the case cited and with Slattery v. Transportation Co., 91 Mo. 217.

Money Judgment.

II. (1) Jean B. Boulicault was asked under whose supervision the bookkeeper worked. He replied: "Under the sole supervision of Louis T. Maguire." A motion to strike out this answer was made. The court overruled the motion, and said: "You can examine him on that." This is assigned for error. The answer was responsive to the question. Appellant awaited the answer and then, after it proved unfavorable, he made his objection. He cannot now be heard to assert error on this ruling. [State v. Sykes, 191 Mo. l. c. 79, 80; State v. Forsha, 190 Mo. l. c. 326, 327, and cases cited.]

Motion to Strike Out.

(2)    Complaint is made that the trial court did not permit an examination of Boulicault concerning the capacity of himself and his brother to act as president of the corporation in case the court granted the prayer to remove Louis T. Maguire from office and prohibit him from holding any corporate office thereafter. The court said he could not select officers for the corporation; that if Maguire should be removed, the directors would have to do that. This seems to answer the point made. Further, no offer to show incompetency of any other director or stockholder was made.

Competency of Others.

(3)    On the question whether there was a custom among business corporations to have their books examined once a year, appellant objected in the trial court and complains here that the witness was permitted to give his "individual experience" instead of being required to confine his testimony to the custom. The record shows a remark of the court which it seems was intended to elicit the "practice" of the witness. The record further shows, however, that the witness did not testify as to his "practice" or "individual experience," but directed his answer in terms to existing custom, as appellant contends he should have done. The record, therefore, shows no basis for the contention.

Custom.

III.    It is insisted that respondents are barred by laches; i. e. that respondents are without equity. The cases cited are nearly all cases of acquiescence or ratification. Estoppel is an element of all these; and knowledge is an element of estoppel.

Laches.

(1)    Leon C. Boulicault was not a director, but merely a stockholder. He was not under any obligation to examine the company's books, and had the right, in the absence of special facts, to rely upon the directors and officers properly to conduct the business. The weight of the evidence in the record is that it was not customary, in corporations like this glass company, to have periodical examinations made of the books. The fact that Leon C. Boulicault knew such examinations

were not made did not raise any duty upon his part, therefor. He never acted as a director or offered to act as one, and the suggestion that he was a *de facto* director has no foundation upon which to rest.

(2). Jean B. Boulicault was a director. To this extent his position was different from that of Leon C. Boulicault. If he is guilty of laches, it is because of some neglect of duty the performance of which would have given him knowledge of what was occurring. His position differs also from that of Louis T. Maguire. Maguire was not only a director but also president, manager and treasurer and was in charge of the finances and business of the company and owned a majority of its stock.

IV. In a sense directors of a corporation "are trustees and agents of the corporation and stockholders. In a general way they are governed by the same rules as are applied to trustees and agents" (Bent v. Priest, 86 Mo. l. c. 482), and for a failure to discharge their obligations as such they become liable for corporate losses resulting therefrom. [Thompson v. Greeley, 107 Mo. l. c. 590.] The directors of a business corporation are vested with the control of its business (Sec. 3347, R. S. 1909), and this power entails an obligation to exercise ordinary care to the end that the assets of the corporation shall not be lost or dissipated. This duty extends to all directors, as such, and renders them liable for losses resulting from negligence as well as from actual misfeasance. The care required of directors "is that which ordinarily prudent and diligent men would exercise under similar circumstances, and in determining that, the restrictions of the statute and the usages of business should be taken into account." Quoted in Stone v. Rottman, 183 Mo. l. c. 573. While that case involved bank directors, yet the weight of authority and reason is that it is generally applicable, due consideration being given in each case to the character of the corporation. To some extent the rule depends upon the fact that directors, as such, usually serve without compensation

Duties of Directors.

other than that they receive by sharing with all stockholders in the prosperity of the corporation. This rule defines the measure of the duty of Louis T. Maguire, Charles J. Maguire and Jean B. Boulicault in their several characters as directors only. There are other matters to be considered. Charles J. Maguire received no compensation of any kind and held no office having actual duties and responsibilities. Neither Louis T. Maguire nor Jean B. Boulicault received any compensation as a director. Boulicault's salary was paid him for services as superintendent of the manufacturing plant. Louis T. Maguire was made president, manager of the business and treasurer of the corporation, and undertook the oversight of the business as a whole and its finances. For this he was paid an adequate salary. His course is, therefore not to be judged by the same rule applicable to an uncompensated director whose duties with respect to the finances and oversight of the business of the company arose solely from the fact that he was a director. "A higher degree of vigilance" was required of him because of the very fact that he was chosen and paid for the purpose of having him devote his entire time to the management of the business and finances of the company. [Jones v. Johnson, 86 Ky. l. c. 543; Bank v. Morton, 146 Ky. l. c. 294, 295.] Many decisions take into consideration the lack of compensation as an element in determining what constitutes the requisite care in particular circumstances. In Sec. 2444, 4 Fletcher's Cyclopedia of the Law of Corporations, is quoted with approval the following:

"In some instances the salary paid them (directors), taken into consideration with other circumstances, shows that the corporation was entitled to all or a greater portion of their time and attention, while in others it is clear that they have not undertaken, nor been understood as undertaking, to give the affairs of the corporation any more than occasional attention, consisting chiefly of attendance at meetings of the board of directors, and investigating and voting upon such matters as are there

presented for their action. In the latter cases, directors may doubtless, without rendering themselves liable, be ignorant of many matters affecting the corporate interests of which directors of the other class could remain in ignorance only by a failure to discharge with ordinary fidelity and care the duties of their office.''

What care ''ordinarily prudent and diligent men'' would have exercised under the circumstances, in the capacity of directors only, depends upon (1) what the circumstances were, and (2) what the course of ordinarily careful and prudent men is under such circumstances. Both these raise questions of fact to be determined by the trier of the facts. The confidence all concerned had in the bookkeeper, the fact that no suspicion was directed toward him at any time, and the continued great prosperity of the company—all are to be considered in explanation of Jean B. Boulicault's failure to examine the books of the company. Further, it was doubtless known to all that he had no knowledge of books and accounting, and it was certainly known to all that Maguire had kept the books of the partnership for three years, that he secured the bookkeeper whom he had known from boyhood; that for fifteen years he was constantly in the office where the books were kept; that he presented the annual statement to the directors; and that he was assigned to perform and paid to perform the especial duty of caring for the finances of the company and made the custodian of its funds. He constituted a sort of committee to look after that part of the business. In such circumstances it cannot be said Jean B. Boulicault was under the same duty as that imposed upon Louis T. Maguire. As already stated, the weight of the evidence is that it was not customary to have the corporate books in a small concern like the Oriel Glass Company examined by accountants. In such circumstances it cannot be held that Jean B. Boulicault neglected any duty as director which would have brought him knowledge of the bookkeeper's peculations.

Louis T. Maguire's position as president and manager in charge of the finances and business of the company and custodian of its funds imposed additional duties upon him. In Johnson v. Wagon Co., 118 Wis. 1. c. 449, the court considered the case of a manager in charge of a corporation whose secretary had for seven years overdrawn his salary account. In that connection the court said:

"We must deem it sufficient to say that the finding of the trial court that plaintiff was guilty of negligence in failing to discover and thus in permitting the secretary to withdraw funds of the company in excess of his salary, through a period of some seven years—the secretary being pecuniarily irresponsible, though of excellent reputation and apparently economical habits—is supported by the evidence. We should not sustain the view that one occupying the position of general manager must at all times be cognizant with the condition of every account upon the books, even though they were kept by immediate subordinates of his—less so where kept under the control of an officer having such measure of independence as the secretary had in this case; but one who is charged with the care of a business of this magnitude certainly owes, as a mere measure of ordinary diligence, the duty of some supervision, to see that others having access to its funds are not misappropriating them. Just what acts may constitute fulfillment or breach of that duty, it is unnecessary now to decide. We think it within the judgment of a trial court, in drawing inferences of fact, to hold that the ordinarily diligent man, in plaintiff's position, would have discovered the depletion of its funds long before the plaintiff did. It may reasonably be supposed, too, that, if that discovery had been made while the overdraft was comparatively trifling in amount, reimbursement by the secretary out of his salary might have been possible. When the discovery was made, the amount of the deficiency rendered such result improbable. Hence we cannot say that the court was wrong in concluding that the whole amount of Lund's overdraft at the

time of its discovery, in 1897, might properly be held to be damage resulting from plaintiff's neglect to discover it in proper time, and take effective steps to prevent its increase and secure its repayment.''

The same doctrine is approved and, also, applied, in some degree, to the president of a corporation in Fletcher's Cyclopedia of the Law of Corporations, sec. 2406.

Louis T. Maguire admitted he signed checks on the company's account, payable to the bookkeeper, with the blanks for amounts left unfilled; that he never compared the checks returned with the check-book stubs; and never discovered that the total of the checks returned exceeded the aggregate of the approved accounts, though such total did exceed that amount each month for years. He never gave any attention to these things, though he, himself, had issued the checks in blank. So far as the record shows only he and the bookkeeper knew of this practice in issuing checks. We hold that this constituted such negligence as to justify the judgment rendered in the trial court and require its affirmance. All concur except *Graves, J.,* who dissents.