# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1820

_____

Securities and Exchange Commission,    *
                                       *

       Plaintiff - Appellant,           *

                                        *    Appeal from the United States
v.                                      *    District Court for the
                                        *    Eastern District of Missouri.

Michael F. Shanahan Jr.,             *

                                        *
       Defendant - Appellee.        *

_____

Submitted: January 11, 2011
Filed: July 19, 2011

_____

Before WOLLMAN, LOKEN, and SMITH, Circuit Judges.

_____

LOKEN, Circuit Judge.

The Securities and Exchange Commission (SEC) brought this civil action against Michael Shanahan Jr., alleging that, as an outside director of Engineered Support Systems, Inc. ("ESSI"), he violated numerous federal securities laws by participating in the grant of backdated, "in-the-money" stock options to ESSI officials including his father, CEO Michael Shanahan Sr. At the close of the SEC's case in chief after eight-and-one-half days of trial, the district court[1] granted Shanahan Jr.'s Rule 50(a)(1) motion for judgment as a matter of law, concluding that the SEC had

---

[1]The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

failed to prove the requisite elements of scienter and negligence. Judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). We review the district court's ruling *de novo*, applying the same Rule 50(a)(1) standard. Roberson v. AFC Enters., Inc., 602 F.3d 931, 933 (8th Cir. 2010). We agree that the SEC's evidence was insufficient in these respects and therefore affirm.

## I. The Practice and Claims at Issue

A company whose common stock is registered with the SEC and publicly traded, such as ESSI during the time in question (1996 to 2002), must disclose to shareholders and investors the compensation paid to its executives. One common form of compensation is the stock option, which grants a recipient the right to purchase a specified number of shares of the company's stock at a specified price, referred to as the "exercise" or "strike" price. When the market price of a publicly traded stock is equal to an option's exercise price, the option is said to be "at the money." When the market price exceeds the exercise price, the option is "in the money." If an option is "at the money" when granted, it will only enrich the recipient if the stock price rises in the future. But if the option is granted "in the money" and can be exercised immediately, it is to that extent equivalent to a cash bonus if the recipient is an employee. The grant of "in-the-money" options rewards favored employees without requiring cash outlays by the company. But it also affects investors because it dilutes the position of shareholders when the option is exercised.

The issue in this case is "backdating." Like the plans of most publicly held companies, ESSI's Stock Option Plan for employees and consultants provided, "The option price of shares subject to any Stock Option shall be the closing price of the Stock on the date that the Stock Option is granted." This appears to be a requirement that options be granted "at the money." But if those administering the plan select a

grant date prior to the date when they make the final decision to grant an option, when the stock's price was lower, and set the exercise price as the closing price on that prior date, the option complies with the literal language of this provision but grants immediate "in-the-money" compensation to an employee recipient. Must this practice be disclosed as some form of executive compensation in the company's financial reports that are filed with the SEC and published to investors and shareholders? As one circuit recently summarized this complex question:

> Backdating options is not itself illegal under the securities laws, nor is it improper under accounting principles. Under Generally Accepted Accounting Principles ("GAAP") Board Opinion No. 25 ("APB 25"), however, backdated options must be recorded as a compensation expense to the corporation because they effectively give recipients immediate compensation . . . . A corporation that fails to follow APB 25 and record backdated options as a compensation expense will necessarily misstate its expenses and income in its financial reports.

Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 594 F.3d 783, 788 (11th Cir. 2010). ESSI at all times in question retained a major accounting firm to help ensure that its SEC filings and investor disclosures were proper.

In this case, the SEC alleged that ESSI engaged in unlawful undisclosed backdating of options granted to its executives during the time in question. But the SEC did not allege or attempt to prove that ESSI failed to follow APB 25 (or any other accepted accounting principle) in failing to disclose this practice in its filed proxy statements and Form 10-K annual financial statements. Rather, the SEC alleged ESSI's backdating was fraudulent because it violated ESSI's unambiguous representation in its proxy statements and financial-statement footnotes that all options had been and would continue to be granted at an exercise price equal to the fair-market price of ESSI's stock on the date of the grant. Like the parties and the district court, we will refer to these statements as the Option Pricing Sentence or "OPS."

-3-

Alleging that the OPS was "materially false," or at least omitted "material facts relating to the Company's stock option program," the SEC's complaint asserted that the practice resulting in the following violations:

(1) Securities fraud in violation of Section 17(a)(1), (2), and (3) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5;

(2) Issuing false or misleading proxy solicitations in violation of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a); and Exchange Act Rule 14a-9, 17 C.F.R. § 240.14a-9; and

(3) Aiding and abetting ESSI's filing of a false annual report in violation of Section 13(a) of the Exchange Act, 15 U.S.C. §§ 78t(e), 78m(a); and Exchange Act Rules 12b-20 and 13a-1, 17 C.F.R. § 240.12b-20, .13a-1.[2]

The complaint sought a permanent injunction against future violations, disgorgement of ill-gotten gains, civil monetary penalties, and an order barring Shanahan Jr. from acting as an officer or director of any publicly traded company.

## II. Securities Fraud: § 17(a), § 10(b), & Rule 10b-5

To establish a violation of these antifraud provisions of the federal securities laws, the SEC must prove that Shanahan Jr. made a material misstatement or omission in connection with the offer, sale, or purchase of a security by means of interstate commerce. See SEC v. Phan, 500 F.3d 895, 907-08 (9th Cir. 2007). Violation of § 17(a)(1), § 10(b), and Rule 10b-5 require proof that Shanahan Jr. made

_____

[2]The SEC does not appeal the district court's grant of summary judgment dismissing an additional claim that Shanahan Jr. aided and abetted ESSI's violation of § 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A). See SEC v. Shanahan, No. 4:07-cv-270, 2010 WL 148440, at *5-6 (E.D. Mo. Jan. 12, 2010).

misrepresentations or misleading omissions with scienter; violation of § 17(a)(2) and (3) require proof that he acted negligently. See Aaron v. SEC, 446 U.S. 680, 695, 697, 700-01 (1980). The district court concluded that the SEC offered insufficient evidence to satisfy either standard. To frame these issues, we will begin by summarizing the SEC's proof of the other elements of securities fraud.

During the period in question, because shareholders were being asked to approve an additional allocation of ESSI shares to the Plan, every proxy statement included a "Report of the Compensation Committee." The full text of the Plan also appeared in ESSI proxy statements whenever the Board of Directors sought shareholder approval of a revised Plan. Both the proxy statements and each version of the Plan included the OPS (with minor textual variations). In addition, each ESSI Form 10-K annual report filed with the SEC and available to purchasers and sellers of ESSI stock included the OPS in a "Shareholders' Equity" footnote:

> . . . [O]ptions may be granted to employees and directors of the Company to purchase shares of the Company's common stock. Options granted are at an option price equal to the market value on the date the option is granted. . . . The Company applies Accounting Principles Board Opinion No. 25 . . . and related interpretations in accounting for all stock option plans. Accordingly, no compensation expense has been recognized for stock option awards.

The SEC's expert statistician, Professor of Finance Randall Heron, testified that between 1995 and 2002, ESSI granted options having an exercise price equal to the stock's lowest price during that month eleven times, nine of which also coincided with the stock's lowest price of the quarter, a pattern that disappeared after passage of the Sarbanes-Oxley Act in July 2002.[3] According to Heron, the probability of the pre-

---

[3]The Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 403(a), 116 Stat. 745, 788 (July 30, 2002), codified at 15 U.S.C. § 78p(a)(2)(C), requires firms to disclose stock-option transactions to certain officers and directors within two business days

Sarbanes-Oxley grants occurring as they did *without* backdating was less than one in a billion. Thus, the SEC presented ample evidence to submit to the jury the issue whether ESSI granted "backdated" options.

The SEC also presented ample evidence that Shanahan Jr. was a knowing participant in this process. The Stock Option Plan provided that it was administered by the ESSI Compensation Committee, which was given authority to "determine optionees and the number of shares subject to each option granted," subject to approval by CEO Shanahan Sr. During the entire period in question, the Compensation Committee consisted of Shanahan Jr. and two or three other nonmanagement directors. The Compensation Committee met once or twice per year to discuss issues including the grant of stock options. ESSI Vice-President/Controller Steve Landmann, a certified public accountant and witness for the SEC, testified that he initially drafted ESSI's stock-option plans, proxy statements, and Forms 10-K and then circulated his drafts to all Board members, including Shanahan Jr.[4] Landmann also prepared for Shanahan Sr.'s signature option certificates and grant letters notifying employee-recipients of their awards. Rather than dating the options on the date the certificates were prepared and pricing them "at the money" on those dates, Landmann used earlier dates provided by Chief Financial Officer (CFO) Gary Gerhardt. Gerhardt, also a witness for the SEC, testified that "the price would have been established by some combination of everybody involved" and admitted that "the dates that we ended up picking were low dates."

---

and, according to expert-witness Heron, thereby "reduce[d] the ability to look back through time and potentially backdate an option."

[4]Landmann testified that he received proposed changes to the draft proxy statements from Shanahan Jr. "more than once." In support, the SEC introduced a copy of a 1999 statement in which Shanahan Jr. made handwritten changes to the "Employment Agreements" section of the Compensation Committee Report.

Shanahan Jr., called by the SEC during its case in chief, testified that he and the Compensation Committee focused primarily on the complex task of allocating available options among the executives in this rapidly expanding enterprise, leaving option pricing to the finance and accounting departments. But the SEC introduced numerous documents approved by the Committee and by Shanahan Jr. reflecting the grant of options bearing dates prior to the apparent decision dates that resulted in lower exercise prices. For example, on July 25, 2002, Shanahan Jr. sent an email to Gerhardt asking, "If the options have not been issued to date, I think yesterday[']s close was a new low for the quarter. Can we go with the lower number? Do we need to have a comp. meeting to do it?" Subsequent emails reflected that the final allocation of these options was not approved before August 8, 2002, yet the grant certificates bore a July 24, 2002 date and price.

The SEC's evidence was far weaker on the question whether ESSI's backdating practice together with the OPS constituted false statements or omissions made in connection with the offer, sale, or purchase of securities. ESSI literally complied with the OPS because the exercise price was always "the closing price of the Stock on the date that the Stock Option is granted," that is, the date that appeared on the option certificate. The SEC argues on appeal that "the only reasonable reading" of the OPS was that it misrepresented "that ESSI did not, and would not, issue backdated options." But the only *evidence* that this was the only reasonable reading of the plain language of the OPS was the opinion of statistical expert Heron, who was not qualified as an expert on this question and whose lay opinion was of little if any probative value. Moreover, on cross-examination Heron admitted that a colleague had published a prominent article on the subject noting:

> the stock option plans that I have looked at do not explicitly prohibit such activities. The plans generally state that the exercise price should be the market price at the grant date, but do not state that the grant date cannot precede the decision date.

Erik Lie, <u>On the Timing of CEO Stock Option Awards</u>, Mgmt. Sci., Vol.51, No. 5, 802, 807 (May 2005).

The SEC's evidence that ESSI's backdating practice and its OPS disclosures were *materially* fraudulent was even more deficient. Proof of materiality requires proof of "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988) (quotation omitted). The SEC's only witness on this issue whose testimony is in the record on appeal was Selman Akyol, a research analyst for a brokerage firm who analyzed ESSI's stock during the period in question. Akyol testified:

> Q.     Mr. Akyol, were you ever aware before 2006 that ESSI was pricing stock option grants in-the-money or -- or backdating those grants?
>
> A.     No, I was not.
>
> Q.     Mr. Akyol, as an analyst, is that something you would have liked to have known during the time -- period of time you covered the company?
>
> *     *     *     *     *
>
> A.     Yes.
>
> Q.     Why is that?
>
> A.     As an analyst, I would like to know everything.

We have reviewed how the SEC's case was weak as to falsity and almost non-existent as to materiality because these deficiencies were highly relevant to the two issues on which the district court granted judgment as a matter of law, scienter and negligence.

**A. Scienter.** The element of scienter requires proof of "intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). Although the Court has repeatedly declined to address the issue, most recently in Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1323 (2011), we are among the circuits holding that a finding of scienter may be based upon "severe recklessness," that is:

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 654 (8th Cir. 2001) (quotation omitted). This definition of recklessness is "the functional equivalent for intent," requiring proof of "something more egregious than even 'white heart/empty head' good faith." Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir.), cert. denied, 434 U.S. 875 (1977). It is insufficient to show that a defendant *should have known* that a material statement or omission was false or misleading. "That is a viable claim of negligence, but not of fraud." In re Ceridian Corp. Secs. Litig., 542 F.3d 240, 249 (8th Cir. 2008).

At the close of the SEC's evidence, the district court found "no evidence that Mr. Shanahan, Jr. knew the alleged omissions or misrepresentations at issue . . . presented a danger of misleading buyers or sellers," and insufficient evidence to permit a finding that "the alleged misrepresentations or omissions . . . presented a danger of misleading investors so . . . obvious that Mr. Shanahan, Jr. must have been aware of it." We agree.

Shanahan Jr. testified that he relied on the ESSI finance and accounting departments, outside and general counsel, and the company's independent auditors to

ensure that the stock option Plans were properly administered and that ESSI proxy statements made appropriate and accurate disclosures. It is undisputed that none of these professionals ever raised to Shanahan Jr. any concern regarding option dating and pricing and the OPS disclosures.[5] He never questioned the accuracy of the OPS and did not recall discussing the meaning or import of the OPS during Compensation Committee meetings. Depending on others to ensure the accuracy of disclosures to purchasers and sellers of securities -- even if inexcusably negligent -- is not severely reckless conduct that is the functional equivalent of intentional securities fraud. See SEC v. Pasternak, 561 F. Supp. 2d 459, 513-14 (D.N.J. 2008).

The SEC argues that "the danger of misleading investors must have been obvious for Shanahan Jr." because the plain language of the OPS disclosures "so clearly state[s] that the company was issuing at-the-money options." No doubt, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (quotation and ellipses omitted). But to prove severe recklessness that is the functional equivalent of intentional fraud, the SEC must prove that the danger of misleading buyers or sellers of securities was so obvious that Shanahan Jr. must have been aware of it. Here, the SEC's evidence failed to meet this heavy burden in two respects.

---

[5]Controller Landmann testified that he often objected to CFO Gerhardt that grant dates that corresponded to prior low points in the price of ESSI stock were improper, but he admitted that "the specific [Plan] language does not tie grant date and decision date." Landmann never raise this concern with either Shanahan Sr. or Shanahan Jr. Gerhardt denied that Landmann ever objected to grant dates or pricing, denied that he ever told Landmann to pick a low date from a range, and testified that he never perceived a problem with ESSI's practice of dating and pricing Plan options. Shanahan Sr. testified that no one, including ESSI's outside auditors, ever told him that the stock-option Plan was being administered improperly.

First, the evidence established that ESSI's option dating practice was not clearly contrary to the plain language of the OPS. As commentator Erik Lie put it, the OPS "d[id] not state that the grant date cannot precede the decision date." It seems likely that the average investor would read the OPS as stating that ESSI does not issue "in-the-money" stock options. But the OPS was ambiguous, and avoiding ambiguous statements that *may* mislead investors was primarily the responsibility of ESSI's accounting and finance professionals, not an outside director such as Shanahan Jr., who had no training in this highly complex subject. The SEC's proof permitted, at most, the reasonable inference that Shanahan Jr. as outside director reviewed and approved an objectively misleading statement with knowledge of facts that rendered the statement misleading.

Second, even if Shanahan Jr. should have perceived an apparent contradiction between ESSI's option dating and pricing practice and its OPS disclosures, he is not liable for securities fraud unless he recklessly failed to see an obvious danger that investors would be materially misled. On this issue, the SEC's weak proof of materiality is fatal to its case. During the period 1996-2002, it is undisputed that no one at ESSI, including its outside auditors who monitored compliance with APB No. 25, perceived that the undisclosed grant of "in-the-money" stock options -- which had no impact on ESSI's financial performance -- would be a material misstatement or omission in connection with purchases and sales of ESSI stock. After unrelated corporate scandals and passage of Sarbanes-Oxley changed public perceptions and the regulatory climate, "backdating" took on the universal look of inherent evil. But evil must be proved based on contemporaneous standards; at least with respect to outside-director Shanahan Jr., the SEC failed to prove it. For example, the SEC's documentary evidence showed Shanahan Jr. consistently initialed and contemporaneously dated documents reflecting that Compensation Committee option-granting decisions were finalized on a date later than the grant date reflected on the option certificates. This transparency is not the behavior one would expect from an intentional or severely reckless violator of the securities laws.

-11-

Based on the SEC's case in chief, no reasonable juror could find that Shanahan Jr.'s participation in the alleged backdating of ESSI stock options posed "a danger of misleading buyers or sellers . . . so obvious that [he] must have been aware of it." Green Tree, 270 F.3d at 654. The SEC's evidence of scienter fell far short of the allegations of fraudulent backdating held to be insufficient in Edward J. Goodman Life Income Trust, 594 F.3d at 790-93. Accordingly, the district court did not err in granting Shanahan Jr. JAML on the SEC's § 17(a)(1), § 10(b), and Rule 10b-5 claims.

**B. Negligence.** Sections 17(a)(2) and (3) of the 1933 Act provide that it is unlawful in the offer or sale of securities "to obtain money or property" by means of an untrue material statement of fact or omission, or to engage in any practice or course of business "which operates or would operate as a fraud or deceit upon the purchaser." Like other circuits, we construe the Supreme Court's decision in Aaron as requiring proof that a defendant acted negligently to establish a violation of § 17(a)(2) or (a)(3). See Pagel, Inc. v. SEC, 803 F.2d 942, 946 (8th Cir. 1986); SEC v. Hughes Capital Corp., 124 F.3d 449, 453, 454 (3d Cir. 1997). In granting judgment as a matter of law dismissing these claims, the district court explained:

> Upon consideration of the standards set forth by the SEC itself through its proposed instructions, I find these claims must also be dismissed for a failure of proof. In other words, the SEC presented no evidence, through expert or lay testimony, documentary evidence or otherwise with respect to the degree of care that an ordinarily careful person would use under the same or similar circumstances, whether Mr. Shanahan, Jr., exercised reasonable care in obtaining and communicating information, or whether he undertook an appropriate investigation before allegedly making statements to investors or prospective investors.

> Finally, and perhaps most importantly, the SEC offered absolutely no evidence regarding Mr. Shanahan, Jr.'s duties as a member of ESSI's Board of Directors and as a member of the Compensation Committee. Absent this basic framework, once again, the Jury would be left to

speculate as to whether a duty existed on the part of Mr. Shanahan, Jr., and, if it did, whether he failed to perform that duty.

On appeal, the SEC argues that ESSI's alleged backdating was "clearly" contrary to the plain language of the OPS, and thus "a jury could determine in light of their common experience in human affairs that Shanahan Jr. recklessly or negligently departed from a reasonable course of action."[6] But, as we have explained, the SEC failed to prove that the OPS was unambiguous. Therefore, determining whether Shanahan Jr. negligently made untrue material statements of fact or omissions, or engaged in a practice that operated as a fraud or deceit upon purchasers of ESSI stock, involved complex issues of options accounting; Plan administration; the intricacies of securities filings; and the proper allocation of responsibilities between ESSI's finance and accounting professionals, outside auditors, inside and outside counsel, Board of Directors, and Compensation Committee. As it is undisputed that Shanahan Jr. was an outside director who had no personal expertise in these matters, that ESSI complied with the accounting principles known at that time to apply, and that no one alerted Shanahan Jr. to any possible concern over ESSI's manner of dating and pricing options issued under the Plan, we agree with the district court that the SEC's failure to present any evidence that he nonetheless violated an applicable standard of reasonable care was fatal to its case.

### III. Issuing false or misleading proxy solicitations: § 14(a) & Rule 14a-9

Section 14(a) of the Securities Exchange Act provides that it is unlawful to solicit a proxy respecting any registered security in contravention of SEC rules and regulations. SEC Rule 14a-9(a) provides that no proxy statement may contain any

---

[6]Shanahan Jr. admitted that his position as ESSI director entailed a fiduciary duty to shareholders. A director's duty of care "is that which ordinarily prudent and diligent men would exercise under similar circumstances." Boulicault v. Oriel Glass Co., 223 S.W. 423, 426 (Mo. 1920) (quotation omitted).

false or misleading statement or omission with respect to a material fact. Section 14(a) "was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 444 (1976) (quotations omitted).

Neither the Supreme Court nor this court has decided whether scienter is an element of an action brought under § 14(a). See Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1090 n.5 (1991); Shidler v. All Am. Life & Fin. Corp., 775 F.2d 917, 926 (8th Cir. 1985) ("strict liability is not the appropriate standard of liability"). We agree with those courts that have concluded that scienter is an element, at least for claims against outside directors and accountants. See Adams v. Standard Knitting Mills, Inc., 623 F.2d 422, 428 (6th Cir.), cert. denied, 449 U.S. 1067 (1980); Salit v. Stanley Works, 802 F. Supp. 728, 733 (D. Conn. 1992). As the SEC failed to prove scienter, that is reason enough to affirm the district court's dismissal of these claims.

Alternatively, we agree with the district court that the SEC failed to prove a negligent violation of § 14(a) and Rule 14a-9 by Shanahan Jr. Whether Shanahan Jr. as outside director exercised reasonable care in overseeing the solicitation of proxies is not the same question as whether he exercised reasonable care in overseeing the disclosure of ESSI's stock-option granting practices to investors. Issues of materiality may well be different, and it may be reasonable to expect an outside director to recognize a misleading proxy solicitation, even if he has no experience with the intricacies of administering stock-option plans. But the SEC's proof made no attempt to address these distinctions and did not counter Shanahan Jr.'s undisputed testimony that he did not draft the proxy statements, believed the statements were truthful and accurate, did not perceive that the OPS might be misleading in light of ESSI's options dating and pricing practice, and was never made aware of any reason to be concerned that this practice was not fully disclosed.

-14-

On this record, we agree with the district court that, absent probative evidence regarding Shanahan Jr.'s duties as outside director and member of the Compensation Committee, the jury could only speculate as to whether he failed to exercise reasonable care in overseeing ESSI's proxy communications with shareholders. The evidence at trial established, during the time in question, serious debate among accounting professionals as to the appropriate manner in which to price employee stock options, and academic debate surrounding the propriety of retrospectively priced options. Compare Shidler, 775 F.2d at 927 & n.14 (upholding a finding that defendants were not negligent in soliciting proxies for a merger using a voting procedure later determined to violate an ambiguous Iowa statute).

## IV. Aiding and Abetting: § 20(e)

To establish aiding and abetting liability under § 20(e) of the Securities Exchange Act, the SEC must prove (1) a primary violation of the securities laws; (2) "knowledge" of the primary violation on the part of the alleged aider and abettor; and (3) "substantial assistance" by the alleged aider and abettor in achieving the primary violation. K&S P'ship v. Cont'l Bank, N.A., 952 F.2d 971, 977 (8th Cir. 1991), cert. denied, 505 U.S. 1205 (1992). "Negligence . . . is never sufficient," and "a bare inference that the defendant must have had knowledge" of the primary violator's transgressions is insufficient. Camp v. Dema, 948 F.2d 455, 459 (8th Cir. 1991) (quotation & citation omitted).[7] Here, even if we assume a primary violation of § 13(a) of the Securities Exchange Act and Rules 12b-20 and 13a-1 by ESSI based upon the presence of the OPS in its shareholder-disclosure documents, the SEC's

---

[7] Section 20(e) of the Securities Exchange Act has recently been amended to include liability for persons who "recklessly provide[] substantial assistance to another person in violation of a provision of this chapter." See Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 929O, 124 Stat. 1376, 1862 (July 21, 2010), codified at 15 U.S.C. § 78t(e). This amendment, however, is not applicable to this appeal.

failure to prove that Shanahan Jr. was severely recklessness or negligent regarding the parallel violations alleged against him was also a failure to prove "knowledge" of ESSI's alleged primary violations. Therefore, the district court's dismissal of the § 20(e) claim must be affirmed.

## V. The District Court's *in Limine* Ruling

Prior to trial, the district court granted Shanahan Jr.'s motion *in limine* to exclude any reference to an Incentive Stock Option Agreement between Shanahan Sr. and ESSI granting Shanahan Sr. 10,000 additional stock options per point each time ESSI's stock closed above its previous record high. When initially proposed by Shanahan Jr. in June 1998, the Agreement was characterized by the chairman of the Compensation Committee as "ridiculous" because it "would end up [granting options for] more stock than we had outstanding." Nevertheless, the SEC contended, the Agreement was implemented in 2001, without appropriate proxy statement disclosures, resulting in Shanahan Sr. receiving options to acquire 1.2 million shares in 2001 and 2002, twenty times more than he received in 1997. The district court granted the motion *in limine* under Rules 404(b) and 403 of the Federal Rules of Evidence, explaining that any alleged impropriety was not "sufficiently similar to the backdating issues that are at the center of this case," that the issue risked confusing the jury, and that it would waste time.

On appeal, the SEC argues that this evidence should have been admitted to show "motive, intent, plan or scheme, absence of mistake, and to demonstrate Shanahan Jr.'s active role and substantial influence on the Compensation Committee." At the least, the SEC argues, the court abused its discretion in not admitting as evidence of Shanahan Jr.'s involvement in the backdating of stock options a January 10, 2001 email from Shanahan Jr. to Gerhardt on the subject of "MFS Stock Options (incentive)" stating:

> Your calculations seem in line to me as far as the number of shares is concerned. The option price should be the same as the other options issued to the group that year. If there was more than one option price issued, then the average of those prices should be used. Your thoughts?

A district court has broad discretion whether to admit evidence, and we will not reverse "absent a clear and prejudicial abuse of that discretion." Hoselton v. Metz Baking Co., 48 F.3d 1056, 1059 (8th Cir. 1995) (quotation omitted); accord Coast-to-Coast Stores, Inc. v. Womack-Bowers, Inc., 818 F.2d 1398, 1403-04 (8th Cir. 1987). Here, the Agreement touched on several complex, collateral matters, including whether it ever became part of Shanahan Sr.'s employment contract. There was no clear abuse of discretion in excluding it under Rule 403. Moreover, the Agreement and the email in question would have been cumulative to other evidence showing Shanahan Jr.'s involvement in administering the employee stock option Plan and would not have cured the deficiencies in the SEC's proof of recklessness and negligence. Accordingly, any abuse of discretion was not prejudicial.

The judgment of the district court is affirmed.

_____