[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-10954

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 19, 2010
JOHN LEY
ACTING CLERK

D. C. Docket No. 06-01716-CV-T-23-EAJ

EDWARD J. GOODMAN LIFE INCOME TRUST,
on behalf of itself and all others similarly
situated, et al.,

                                                            Plaintiffs,


LABORERS PENSION TRUST FUND FOR NORTHERN
CALIFORNIA AND PENSION TRUST FUND FOR
OPERATING ENGINEERS,

                                                    Plaintiff-Appellant,


versus


JABIL CIRCUIT, INC.,
FORBES I.J. ALEXANDER,
SCOTT D. BROWN,
LAURENCE S. GRAFSTEIN,
MEL S. LAVITT, et al.,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(January 19, 2010)

Before DUBINA, Chief Judge, BIRCH and BLACK, Circuit Judges.

DUBINA, Chief Judge:

Appellants Laborers Pension Trust Fund for Northern California and Pension Trust Fund for Operating Engineers ("the shareholders") appeal the district court's order dismissing their class action securities law claims against Jabil Circuit, Inc. ("Jabil") and its officers and directors (collectively "Appellees") under Fed. R. Civ. P. 12(b)(6). We affirm the district court order dismissing the complaint and all of the claims included because its allegations fail to meet the heightened pleading standards imposed by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 (2006), and Fed. R. Civ. P. 9(b).

## I. BACKGROUND

The shareholders represent a class of investors who purchased publicly traded Jabil stock from September 19, 2001, to December 21, 2007 (the "class period"). Jabil is a publicly traded electronics and technology company headquartered in St. Petersburg, Florida. The remaining individual Appellees held

a directorship or officership at Jabil for some portion of the class period, including Appellee Timothy Main, who served as CEO, President, and a director of the company.

Part of Jabil's compensation program during the class period involved issuing stock options to officers, directors, and employees of the company. Jabil's own corporate policy required the exercise price of these options to be "at least equal to fair market value." The shareholders allege in their complaint that Jabil violated this policy by issuing backdated options. The issue price of backdated options comes from a day where the trading price was lower than that on the actual date it is issued, resulting in an instant paper gain to the issuee. The specific allegations of backdating in the complaint rely almost exclusively on circumstantial evidence (analyst commentary and comparative graphs) to show that stock option grants to executives were backdated. At no point does the complaint identify any particular transaction or scheme of backdating or specific recipients of such a scheme.

Backdating options is not itself illegal under the securities laws, nor is it improper under accounting principles. Under Generally Accepted Accounting Principles ("GAAP") Board Opinion No. 25 ("APB 25"), however, backdated options must be recorded as a compensation expense to the corporation because

3

they effectively give recipients immediate compensation in the form of options redeemable in the marketplace for profit. A corporation that fails to follow APB 25 and record backdated options as a compensation expense will necessarily misstate its expenses and income in its financial reports.

During the class period, Jabil represented in several financial reports that it had followed APB 25 in constructing its periodic accounting statements. Furthermore, in requesting approval of its employee compensation practices via proxy solicitations during the class period, Jabil represented in those proxy statements that (1) the policy for which it sought approval included granting stock options only at fair market value, and (2) in the past, all stock options were granted at fair market value.

In March 2006, the *Wall Street Journal* reported on various technology companies whose executive officers received stock options that seemed consistently timed to grant the executives stock options at a low price in the period, followed by a run-up in the stock price. The timing aroused the author's suspicions, raised the possibility of backdated options, and led an expert to conclude that the likelihood of the options granted to Appellee Main occurring randomly was "one in one million."

The Securities and Exchange Commission launched an informal

4

investigation of Jabil's stock option practices, and the company itself assembled a special committee to review the allegations. Though the committee found no evidence that high-level employees had been issuing themselves backdated options, it did conclude that Jabil had misapplied APB 25 to many of the stock options it had granted for fiscal years 1996 through 2005. This misapplication resulted in an overstatement of earnings by $54.3 million during that period, forcing Jabil to restate its earnings for each of those years.

The company explained that the restatement resulted from *misdating* stock options, not *backdating* them. Specifically, Jabil cited three primary causes of the accounting errors: (1) changes to groups of people receiving grants, though the initial measurement date was not changed correspondingly; (2) new grants issued after initial grants had gone "underwater" but not properly accounted; and (3) improperly accounted stock option grants to a non-employee director for consulting services. The company denied, and continues to deny, that it ever purposely backdated stock options to its directors. Of the restated amount, $48.9 million actually resulted from increased compensation expense for *non-executive* employees.

Shortly after the allegations of backdating appeared in the *Wall Street Journal*, Jabil issued a press release raising projections for the third quarter in

5

fiscal year 2006. The shareholders allege that Jabil raised these forecasts in order to divert attention from the allegations concerning backdating, and that Jabil knew that the factual bases for its improved forecasts were false even at the time it made the projections. The complaint relies on the testimony of several confidential witnesses described to have access to corporate information at the time of the revised projections. The witnesses allege that the Appellees must have known that the factual bases for the improved forecasts were false. Only one of those witnesses, however, identifies a single individual Appellee, Main, as having any specific knowledge.

The shareholders allege that the Appellees' securities law violations caused them economic loss during the class period. After the first voluntary amendment, the district court dismissed the complaint without prejudice on April 9, 2008. *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 560 F. Supp. 2d 1221 (M.D. Fla. 2008). The shareholders amended and refiled their complaint, which the district court dismissed with prejudice, *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253 (M.D. Fla. 2009) ("*Goodman*"), leading to the instant appeal.

## II. STANDARD OF REVIEW

We review the dismissal of a complaint for failure to state a claim *de novo*.

*Rosenberg v. Gould*, 554 F.3d 962, 965 (11th Cir. 2009).

## III. DISCUSSION

A. *Section 10(b) and Rule 10b-5 Claims: Policy Statements and Financial Reports*

To state a fraud claim under section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege: (1) the existence of a material misrepresentation or omission, (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) on which the plaintiff relied, and (5) which was causally connected to (6) the plaintiff's economic loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S. Ct. 1627, 1631 (2005). As with any fraud claim, a plaintiff must plead the circumstances of the conduct with particularity. *See* Fed. R. Civ. P. 9(b); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006). Complaints alleging falsity "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Additionally, a complaint must present facts from which "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S. Ct. 2499, 2510 (2007); *see also* 15 U.S.C. § 78u-4(b)(2).

7

The district court held that the shareholders failed to adequately plead that Jabil's statements about its stock-option practices during the class period were fraudulent under section 10(b) and Rule 10b-5. *Goodman*, 595 F. Supp. 2d at 1265–66. Specifically, the district court held that the shareholders failed to adequately plead falsity of the allegedly fraudulent statements, failed to raise a sufficient inference of scienter on the part of the Appellees, and failed to plead enough facts to show loss causation. *Id.* at 1266–79. Because we agree with the district court's conclusion about the insufficient inference of scienter raised by the complaint, we need not address its conclusion on loss causation.

1. *Falsity*

The district court viewed the complaint as an attempt to construct a narrative based on a scheme of backdating options and granting them to corporate officers. As a result, the district court concluded that the speculative allegations in the complaint "fail[] to adequately allege backdating" because they detail "neither any particular defendant's role in the backdating scheme nor when or how any particular stock option was backdated." *Goodman*, 595 F. Supp. 2d at 1268–69.

The shareholders respond that the falsity they allege is not false option grants, but rather false statements about the dating of those grants contained in financial and policy statements. They contend that Jabil's decision to restate

8

financial reports during the class period is an overt admission that the prior statements were in fact false. The Appellees insist that the district court's conclusion was correct because the shareholders failed to comply with the PSLRA and explain *why* each of the statements was false. Specifically, they contend that the complaint explains the errors in the restatement as a result of an intentional backdating scheme, not as the result of an accounting error. Because the shareholders have not pled the intentional backdating scheme with particularity, the Appellees contend that the complaint inadequately pleads falsity because there is no allegation about why the statements are false.

We agree with the shareholders and conclude that the complaint adequately presents a claim of falsity. Our review of the complaint leads us to depart from the district court's narrow construction of the complaint. Though we concur with the district court's initial conclusion that the shareholders failed to plead any particularized facts about the alleged backdating scheme, their failure to show a backdating scheme only limits the actionable conduct here—it does not foreclose all potential claims. Here, a contention that the financial reports and policy statements were false is plausible, but there is no plausible case of an intentional backdating scheme that can be constructed from the complaint.

2. *Scienter*

The shareholders allege a number of facts that they contend raise a substantial inference of scienter. They allege insider trades by the Jabil officers during the class period and point to the insider status of each Appellee, financial benefits and motivation to artificially inflate the stock price, the admitted GAAP violation, the membership of several Appellees in the corporate committee that directed stock option grants, and the accounting expertise of several of the Appellees. The district court evaluated all of these circumstances and concluded that, taken together, they failed to create a strong inference of scienter. *Goodman*, 595 F. Supp. 2d at 1272-73.

In this circuit, scienter consists of intent to defraud or "severe recklessness" on the part of the defendant. *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989).

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* (internal quotation marks omitted). The shareholders offer a mixed set of circumstantial facts that they claim indicate intent to defraud, or at least the Appellees' severe recklessness in failing to discover the accounting errors.

The shareholders charge the district court with failing to aggregate their

10

factual allegations in evaluating the inference of scienter, as permitted by our decision in *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004). They effectively concede that no single allegation, standing alone, is sufficient to meet the *Tellabs* standard, *see* 551 U.S. at 324, 127 S. Ct. at 2510, which requires the complaint to offer a cogent and compelling inference of scienter, but contend that the district court erred by considering each allegation in a vacuum. Jabil responds that all of the allegations here, even after aggregation, fail to raise a cogent and compelling inference of scienter.

In *Rosenberg v. Gould*, 554 F.3d 962 (11th Cir. 2009), we recently confronted the specific question of whether similar allegations in a complaint that alleged a backdating scheme satisfied the standard for pleading scienter. There, the plaintiff alleged that the defendant fraudulently issued backdated stock options, signed false securities filings, and overstated earnings during the plaintiff's stock ownership. To provide a strong inference of scienter, the plaintiff alleged that (1) the defendant had responsibility to make decisions about stock option grants; (2) the mismeasurement of stock option grants resulted in substantial additional compensation expenses; (3) the defendant himself was granted allegedly misdated stock options; (4) the defendant made materially false statements; (5) the defendant sold approximately 39 percent of his shares during the class period; and (6) the

11

defendant resigned from the corporation after the discrepancies came to light. *Id.* at 966.

We held that all of these allegations failed to create an inference of scienter that exceeded other inferences of nonfraudulent intent. *Id.* We reasoned that it was most plausible that the defendant did not realize that the backdated options would affect later financial statements because he had no accounting experience. *Id.* We also concluded that the restatement, as a percentage of total revenue during the class period, was *de minimis* and would not have alerted the defendant to the false statements. *Id.* Finally, we rejected the assertion that backdating stock options is inherently an intentional fraud that demonstrates scienter. *Id.*

The allegations in this case are strikingly similar to those we encountered in *Rosenberg*. The shareholders contend that the accounting expertise of several of the Appellees in this case distinguishes the two cases, because some Jabil executives should have known about the proper accounting practices. The accounting experience of some of the Jabil executives, however, fails to provide the critical distinction here because the shareholders do not plead any facts that indicate that any individual Appellee knew about the accounting irregularities during the class period. As a result, the allegations of misrepresentations, responsibility for granting misdated options, and personal profiteering fail to raise

12

a strong enough inference of scienter here, just as they failed to do so in *Rosenberg*.

The shareholders strongly insist that the $54.3 million accounting error was too large for Jabil to ignore without some fraudulent intent. In their complaint, they detail the restated amounts during the class period as a percentage of net income during each fiscal year, reaching nearly 50% in one year. These allegations fall short of those evaluated in *Rosenberg*, however, because they present the restated amounts as a percentage of net income and not total revenue. Because net income can vary so widely period to period, using it as a baseline for comparison provides the court no real standard on which to judge the significance of the accounting error. This pleading strategy—picking the metric that will yield the highest percentage values—adds nothing to the inference of scienter that the shareholders attempt to create.

We will, however, address the weight of scienter allegations cumulatively, and next consider several individual allegations not addressed by our decision in *Rosenberg*. The shareholders contend that the district court improperly resolved a factual dispute by determining that the GAAP provision at issue here, APB 25, was not a simple accounting policy, a violation of which would be reckless. *See Goodman*, 595 F. Supp. 2d at 1277. Evaluating whether alleged conduct rises to

13

the required level of scienter is not prohibited fact-finding. Because we permit

recklessness to suffice as scienter only when "highly unreasonable" and "an

extreme departure from the standards of ordinary care," it is necessary for a court

to determine at the pleading stage whether the conduct alleged conformed to

standards that exist outside the face of the complaint. *Cf. McDonald*, 863 F.2d at

814.

The shareholders demand that we accept all allegations in the complaint as

true—that we must credit not only the allegation that Jabil violated APB 25 but

also that doing so is so severely reckless as to raise a compelling inference of

scienter. The former is a factual allegation, but the latter is a legal conclusion that

we are not required to accept. Under the PSLRA, it is our duty to determine

whether the facts alleged raise a cognizable claim. We emphasize that the unique

nature of the PLSRA requires us to resolve this question, whether the alleged

conduct is severely reckless, at the pleadings stage, though doing so would be

improper in most other contexts. But evaluating the complexity of APB 25 is not

necessary in this case, because the shareholders have failed to allege any facts

indicating that any individual Appellee knew that the accounting standard was

being violated.

In *Ziemba v. Cascade International, Inc.*, 256 F.3d 1194, 1209–10 (11th Cir.

14

2001), we noted that a violation of GAAP by a corporation can raise an inference of scienter when the defendants also ignored "red flags" warning them of the accounting irregularities. Here, the shareholders contend that the gross amount of the error was itself a "red flag" that should have pointed Jabil insiders to the accounting error. Without an allegation that puts this amount in context of total corporate business, however, it is impossible for us to determine from the complaint whether any insider should have noticed the errors.

The shareholders also insist that the *Wall Street Journal* article alleging backdated stock options received by Main was a "red flag" recklessly ignored by Jabil insiders. This "red flag" does not match the allegations that the shareholders now pursue in the complaint—that this is a case of known accounting fraud, not intentional backdating of stock options. The *Wall Street Journal* article may support a case for actual backdating, but would not raise suspicion that numerous stock options had been misdated and misaccounted. The article raised the claim that one particular insider received intentionally backdated options; it did not raise the claim that numerous options granted by Jabil to many classes of employees were improperly recorded in Jabil's financial statements throughout the class period.

The shareholders also note a large number of stock trades made by the

insider Appellees during the class period. They claim that these trades serve as evidence that the officers knew that the financial statements were false and intended to capitalize on that knowledge at the expense of the uninformed public. Stock sales by insiders are only relevant to scienter when they are suspicious. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 (11th Cir. 2008). The complaint must allege some information about the insider's trading history for us to determine whether "the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *See id.* (quoting *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 747 (8th Cir. 2002)); *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (noting that "whether the sales were consistent with the insider's trading history" is a relevant factor); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 543 (5th Cir. 2008) (noting that suspicious sales are those made out of line with earlier trading customs).

The shareholders failed to plead any information about any Appellee's trading history before the class period. As a result, there is no way to determine from the complaint that the sales of large numbers of shares is suspicious enough to add to an inference of scienter. We give the conclusory allegations of insider trading no weight in considering the inference of scienter raised by the complaint.

16

Ultimately, we hold that the allegations contained in the complaint do not create an inference of scienter that is at least as probable as a non-fraudulent explanation—namely that none of the Appellees knew of the accounting errors until the investigation began in 2006. The allegations here fit almost entirely within the confines of *Rosenberg*, and we have in other circumstances rejected the additional allegations contained in the complaint not addressed by the *Rosenberg* decision. The shareholders are correct to insist that the inference of scienter be aggregated from all of the complaint's allegations, but we simply have no substantial allegations to aggregate. The section 10(b) and Rule 10b-5 claims based on the financial restatements fail because they lack sufficient allegations of scienter.

B. *Section 10(b) and Rule 10b-5 Claims: Insider Trading*

The shareholders next contend that the district court erred in dismissing their section 10(b) and Rule 10b-5 claims against the individual Appellees for insider trading. Though we recognize that an insider trading scheme can itself be a deceptive act or practice under the anti-fraud provisions, *see Chiarella v. United States*, 445 U.S. 222, 230, 100 S. Ct. 1108, 1115–16 (1980), the complaint inadequately alleges fraudulent insider trades. The district court correctly noted that "the plaintiffs fail to state which defendant knew what information and why

17

the information was material." *Goodman*, 595 F. Supp. 2d at 1288.

Scienter is a component of section 10(b) and Rule 10b-5 insider trading claims. *SEC v. Adler*, 137 F.3d 1325, 1340 (11th Cir. 1998). "Scienter necessarily requires that the insider have possession of material nonpublic information at the time the insider trades." *Id.* And, because of this state of mind requirement, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted" with scienter. 15 U.S.C. § 78u-4(b)(2). Though the complaint contains numerous allegations of trades made by individual Appellees during the class period, it fails to make any particularized allegation that any individual Appellee knew about the accounting errors at the time of trading.

The shareholders also allege that the individual Appellees knew about execution problems at Jabil that would cause it to miss quarterly projections, but traded Jabil stock anyway despite their duty to disclose the information or abstain from trading. Through a litany of confidential witnesses, the shareholders contend that the Jabil insiders, collectively, knew at the time of the disputed projections that Jabil would be unable to meet those projections. Our review of the complaint's allegations reveals, however, a dearth of facts indicating any individual Appellee's knowledge about the execution problems at Jabil during the relevant times.

In fact, in only one paragraph of the complaint's relevant allegations is a

single Appellee mentioned by name. There, the shareholders allege that Appellee Main knew about Jabil's delayed performance on a single contract before Jabil revealed that it had missed its third quarter projections. The shareholders specifically allege trades by Main in January and March, 2006, while stating that Main knew "as early as February 2006" about the contract execution issues. This is hardly a particularized allegation that Main knew about material issues at Jabil before he traded. The complaint, by its very terms, admits that Main may or may not have known about the execution issues when he traded in Jabil stock. This inadequate allegation of scienter fails to preserve the insider trading claim against Main. We affirm the dismissal of all the section 10(b) and Rule 10b-5 insider trading claims.

C. *Section 10 and Rule 10b-5 Claims: Business Condition Projections*

The shareholders contest the district court's conclusion that the quarterly projections about which they complain are not a basis for liability because Jabil and its officers and directors are shielded by the PSLRA's safe harbor provision. *See Goodman*, 595 F. Supp. 2d at 1271; *see also* 15 U.S.C. § 78u-5(c)(1) (exempting from liability forward-looking statements "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"). We consider

Jabil's cautionary statements that accompanied the projections in reviewing the dismissal in accordance with 15 U.S.C. § 78u-5(e) (permitting consideration of cautionary statements on a motion to dismiss).

The shareholders contend that the safe harbor provision is inapplicable when the defendant makes the forward-looking statement with actual knowledge of its falsity, no matter how accurate the accompanying cautionary language. By pleading that Jabil insiders knew the falsity of the statements when they made them, the shareholders claim that they have precluded the Jabil officers and directors from invoking the safe harbor in their motion to dismiss. The shareholders do not contend on appeal that the risk factors Jabil enumerated were not meaningfully cautionary within the meaning of the statute.

The shareholders rely on *Lormand v. US Unwired, Inc.*, in which the Fifth Circuit held that the PSLRA's safe harbor provision is not available to defendants who have actual knowledge that their forward-looking statements are false at the time they are made. 565 F.3d 228, 244–45 (5th Cir. 2009). The court cited the statutory safe harbor for the proposition that a defendant may only seek shelter if the plaintiff fails to plead that the defendant had actual knowledge of the statement's falsity when he made it. *Id.* at 244. Because all allegations are considered true at the pleadings stage, the *Lormand* court accepted the plaintiff's

20

assertion that the defendant knew his projection was false before he made it. *Id.*

The Appellees argue that the Fifth Circuit's decision in *Lormand* is incorrect and is in conflict with this circuit's statements about the statutory safe harbor. In *Harris v. Ivax Corp.*, we noted that "if a statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant." 182 F.3d 799, 803 (11th Cir. 1999); *see also Miller v. Champion Enters. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) (noting the same). We agree with the Appellees and hold that an allegation of actual knowledge of falsity will not deprive a defendant of protection by the statutory safe harbor if his forward-looking statements are accompanied by meaningful cautionary language. The language and structure of the statutory provision mandate this result.

The statute offers several ways for a defendant to avoid liability, all written in the disjunctive. *See* H.R. Conf. Rep. No. 104-369, at 43 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 742 (noting that the statute creates "a bifurcated safe harbor"). First, a defendant may avoid liability by showing that his statement was issued with meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1)(A)(i). Or, the defendant can show that the statement was simply immaterial. *Id.* § 78u-5(c)(1)(A)(ii). As a third alternative, the defendant can avail himself of the safe harbor if the plaintiff fails to prove that the statement was made with actual

21

knowledge that it was false. *Id.* § 78u-5(c)(1)(B). Any one of these suffices for the defendant; a top-to-bottom reading of the statute shows that the plaintiff's inability to show knowledge of falsity is only relevant if the defendant is unable to produce meaningful cautionary statements or evidence of immateriality.

This linear reading of the statute comports with its legislative history. "The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement." H.R. Conf. Rep. No. 104-369, at 44 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 743. Congress contemplated that we would consider the cautionary language accompanying forward-looking statements at the pleadings stage. *See* 15 U.S.C. § 78u-5(e) (permitting consideration of cautionary statements on a motion to dismiss). So long as the language accompanying the projections is meaningfully cautionary, the law requires us to be unconcerned with the speaker's state of mind at the time he makes the projections.

Additionally, allowing an allegation of knowledge of falsity to prevent safe harbor would also produce a counterintuitive result. A plaintiff wishing to preclude a defendant from statutory safe harbor "must prove that 'forward-looking' statements were made with 'actual knowledge' that they were false or misleading."

22

*In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005); *see also* 15 U.S.C. §

78u-5(c)(1)(B).  This burden of production has led some courts to conclude that

"[t]o avoid the safe harbor, plaintiffs *must* plead facts demonstrating that the

statement was made with actual knowledge of its falsity."  *See, e.g.*, *Southland Sec.*

*Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 371 (5th Cir. 2004) (emphasis

added); *see also  In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033,

1047 (N.D. Cal. 2007).[1]

Therefore, not only must a plaintiff prove actual knowledge of falsity when

contesting forward-looking statements, but, under the shareholders' rationale, by

so pleading the plaintiff precludes the defendant from utilizing the safe harbor at

the pleadings stage entirely.  In light of Congress's specific provision for courts to

evaluate disputes over forward-looking statements at the pleadings stage, *see* 15

U.S.C. § 78u-5(e), we cannot reach the conclusion that a properly formed

complaint prohibits us from doing so.

Our conclusion is further informed by this circuit's judicially created

bespeaks caution doctrine, whose "statutory equivalent" is the PSLRA safe harbor

provision.  *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 767 n. 18 (11th Cir.

2007); *see also* H.R. Conf. Rep. No. 104-369, at 43 (1995), *reprinted in* 1995

---

[1] In *Harris*, we declined to articulate a specific standard for pleading scienter when the statements at issue are forward-looking.  182 F.3d at 803–04.

U.S.C.C.A.N. 730, 742 (noting that the safe harbor provision "is based on aspects of . . . the judicial created 'bespeaks caution' doctrine"). Under the bespeaks caution doctrine, a forward-looking statement is rendered immaterial as a matter of law when accompanied by meaningful cautionary language. *Merchant Capital*, 483 F.3d at 767. The anti-fraud provisions of the securities laws are plainly disinterested with immaterial statements, no matter the state of mind of the speaker. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S. Ct. 978, 983 (1988). However we cast forward-looking statements accompanied by meaningful cautionary language, an allegation that the speaker knew the statements were false does not convert those statements, mitigated by adequate warnings of risks, into actionable frauds. We affirm the district court's dismissal of the shareholders' fraud claims stemming from the earnings projections because of the applicability of the safe harbor provision.

D. *Section 14(a) Proxy Solicitation Claims*

Section 14(a) of the Securities Exchange Act and Rule 14a-9 collectively prohibit the use of false statements in proxy solicitations associated with registered securities. 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9. The shareholders allege in their complaint that several individual Jabil insiders violated section 14(a) by making false statements in proxy solicitations related to Jabil's stock option

compensation policy. Specifically, they claim that throughout the class period, the Jabil insiders represented that the stock option compensation policy was to grant all options at fair market value, and that this practice had been followed in the past. They contend that they relied on these false statements in approving corporate compensation and stock option policies and that the nondisclosure prevented them from removing the offending corporate directors. The district court held that the lack of an adequately pled backdating scheme precluded the shareholders from showing a falsity in proxy solicitation materials. *Goodman*, 595 F. Supp. 2d at 1290.

To sustain a private claim under section 14(a), a plaintiff must show "that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385, 90 S. Ct. 616, 622 (1970). The transaction at issue must be the source of the plaintiff's injury. *See id.*; *Koppel v. 4987 Corp.*, 167 F.3d 125, 137 (2d Cir. 1999) (noting that both transaction causation and loss causation are components of a section 14(a) claim).

In *General Electric Co. v. Cathcart*, the Third Circuit addressed a section 14(a) claim against corporate insiders based on their alleged non-disclosure of criminal activity and mismanagement of the company. 980 F.2d 927 (3d Cir.

25

1992). The plaintiff claimed that the absence of this information caused him to vote to reelect board members and approve corporate governance rules during the class period. The court affirmed dismissal of the claim and held that the plaintiff's injuries were too attenuated to support a proxy solicitation claim. *Id.* at 933.

The *Cathcart* court held that the plaintiff's real injuries came from mismanagement of the corporation, not the transactions approved via the proxy solicitation materials. *Id.* The court reasoned that the harm to the plaintiffs was only indirect and not sufficient on which to base a section 14(a) claim. *Id.* Essentially, it was management's failure to follow corporate policies, and not the actual election of directors, that contributed to the shareholder's loss.

The claims asserted by the shareholders in this case are analogous to those dismissed by the court in *Cathcart*. Here, the damages suffered by the shareholders were caused not by the policies that they approved via proxy, but by management's failure to follow those policies. Additionally, the election of directors who violated those policies only indirectly caused the shareholders' loss. The adoption of a compensation scheme and reelection of directors was not an essential link to the losses of which the shareholders complain; the insiders' decision to violate company policies was not accomplished or endorsed by any proxy solicitation materials. Because the complaint fails to allege a link between

26

the proxy solicitation and the shareholders' loss, we affirm the dismissal of the proxy solicitation claims.

E. *Section 20A Insider Trading Claims*

Section 20A of the Securities Exchange Act grants a private right of action to shareholders who contemporaneously trade with "[a]ny person who violates any provision [of the act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information." 15 U.S.C. § 78t-1(a). This language means that a plaintiff must first plead a violation of the Securities Exchange Act or its rules before pursuing section 20A insider trading claims. *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994); *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1375 (N.D. Ga. 2004). Because there is no predicate violation on which to base the insider trading claims, we affirm the dismissal of the shareholders' section 20A claims.

F. *Section 20(a) Control Person Liability Claims*

Section 20(a) of the Securities Exchange Act makes persons "who, directly or indirectly, control[] any person liable under any provision of [the act] or of any rule or regulation thereunder . . . liable jointly and severally with . . . such controlled person." 15 U.S.C. § 78t(a). The complaint must adequately allege primary liability for another Securities Exchange Act violation in order to state a

27

claim for secondary liability under section 20(a). *Rosenberg*, 554 F.3d at 967. Because the shareholders have failed to properly plead their fraud and proxy solicitation claims, we affirm the dismissal of their section 20(a) claims.

## IV. CONCLUSION

We affirm the district court's order granting the motion to dismiss the shareholders' entire complaint—one that the district court previously dismissed without prejudice, while giving the shareholders specific instructions about ways to remedy the complaint's deficiencies. The shareholders were unable to follow those instructions, and have failed to adequately allege any actionable securities law violations.

**AFFIRMED.**