**NEW ENGLAND CARPENTERS PENSION FUND, Derivatively on behalf of Leggett & Platt, Inc., Plaintiff–Appellant,**

v.

**David S. HAFFNER, Karl G. Glassman, Matthew C. Flanigan, Ernest C. Jett, Harry M. Cornell, Jr., Feliz E. Wright, Robert Ted Enloe III, Richard T. Fisher, Judy C. Odom, Maurice E. Purnell, Jr., Ralph W. Clark, and Michael A. Glauber,**

and

**Leggett & Platt, Inc., Defendants–Respondents.**

**No. SD 31320.**

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 28, 2012.

Application for Transfer to Supreme Court Denied Dec. 12, 2012.

Motion for Rehearing and/or Application for Transfer to Supreme Court Denied Feb. 26, 2013.

Susan Ford Robertson, of Kansas City, MO, for Appellant.

Joseph Michael Rebein, of Kansas City, MO, for Respondent.

WILLIAM W. FRANCIS, JR., Judge.

New England Carpenters Pension Fund ("the Pension Fund"), a shareholder of defendant Leggett & Platt, Inc. ("Leggett"), appeals the trial court's dismissal without prejudice of its ten-count petition which alleged, in part, that Leggett's officers and directors engaged in the backdating of stock options, as well as the subsequent falsification of financial statements based on their failure to disclose the backdating. In addition to suing Leggett, the petition named twelve current and former executives as defendants, all but two of whom also served as members of Leggett's Board of Directors ("the Board"): David S. Haffner; Karl G. Glassman; Matthew C. Flanigan; Ernest C. Jett; Harry M. Cornell, Jr.; Feliz E. Wright; Robert Ted Enloe III; Richard T. Fisher; Judy C. Odom; Maurice E. Purnell, Jr.; Ralph W. Clark; and Michael A. Glauber (collectively "the Individual Defendants"). The trial court dismissed the Pension Fund's petition. We reverse that decision.

### Factual and Procedural Background

Since 1998, the Pension Fund has owned, at its peak, 1700 shares of stock in Leggett, which is a publicly traded company based in Carthage, Missouri. Leggett currently has approximately 37,000 shareholders holding close to 167 million outstanding shares of stock.

In September 2008, the Pension Fund voluntarily dismissed a shareholder derivative action it had filed in the United States District Court for the Western District of Missouri. The following February, the Pension Fund filed a shareholder derivative action in Jasper County Circuit Court. That action was then dismissed without prejudice on August 12, 2009, for failure to

comply with Rule 52.09,[1] the provision governing the formalities of making demand on a corporation and its shareholders prior to filing a shareholder derivative action.[2] Specifically, the trial court found "the pleadings do not establish any of the exceptions which would excuse [the Pension Fund] from first making demand upon the Board ... and/or the shareholders of [Leggett]."[3] The present shareholder derivative action was filed on August 10, 2010, again in the Jasper County Circuit Court.

The petition at issue alleges ten causes of action, all of which were brought against all defendants, to-wit: breach of fiduciary duty and/or aiding and abetting, accounting, abuse of control, gross mismanagement, constructive fraud, corporate waste, unjust enrichment, common law rescission, common law fraud, and violation of Article 5 of the Missouri Securities Act of 2003. These causes of action all arise out of Leggett's grant of stock options to its officers that the Pension Fund claims were illegally backdated.[4] The backdating allegations are based, in part, upon statistical analyses purporting to show a "1 in 1,000,-000" chance that the option grant dates selected by Leggett were chosen randomly

---

1. All rule references are to Missouri Court Rules (2012).

2. Rule 52.09 provides that:

 In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right that may properly be asserted by it, the petition shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which there is a complaint or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. *The petition shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action desired from the directors or comparable authority and, if necessary, from the shareholders or members and the reasons for the failure to obtain the action or for not making the effort.* The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members is [sic] such manner as the court directs.
 (Emphasis added).

3. While the previous petition did contain some references and statements relating to the requirements of Rule 52.09 under its discussion of Count IX, "INSIDER TRADING[,]" the trial court apparently found the statements were insufficient under the rule.

4. "Backdating occurs when [a stock] option's grant date is altered to an earlier date with a lower, more favorable price to the recipient." *In re CNET Networks, Inc.*, 483 F.Supp.2d 947, 950 (N.D.Cal.2007). It was explained in *In re Zoran Corp. Derivative Litigation*, 511 F.Supp.2d 986, 996–97 (N.D.Cal.2007), that

 [t]he motive for backdating is to avoid a "hit to the earnings," *i.e.*, a compensation expense, while still awarding in-the-money options. Those responsible simply backdate the grants to a date where the stock price was attractively low and pretend that the grant was awarded on the earlier date rather than the real date. Since the paperwork shows that the exercise price is the same as the market price on the phony grant date, they pretend no need exists to recognize an expense.

 The price on the true grant date, of course, is higher than the price on the phony grant date. The company is in effect granting in-the-money options without recognizing the attendant compensation expense. Because the company is underreporting its compensation expenses, the company's earnings appear higher than they truly are. The company also receives a lower price in exchange for the options than it would if the price were measured from the proper grant date.

and, this is significant, according to the Pension Fund, because the·bulk of the challenged grant dates coincided with periodic lows in the market price ·of Leggett's stock.

The petition, encompassing some 169 pages and nearly 300 paragraphs, also contained a section entitled "DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS," which was set out prior to the allegations in any of the ten counts, and contained the Pension Fund's assertions as to why it was excused from serving demand on the Board and the other Leggett shareholders as required by Rule 52.09. Referring to "applicable law," the Pension Fund recited "the longstanding rule" that a shareholder is excused from compliance with the Rule 52.09 requirement to make demand on the Board and shareholders before bringing a derivative action where the allegations in the petition are such that the officers or directors of the corporation committed fraudulent, illegal or *ultra vires* acts that could not be ratified by shareholders. Per this rule, the Pension Fund then alleged that seeking relief from the Board and shareholders would be futile in this situation because the actions alleged to have been undertaken by Leggett via the Board and the Individual Defendants—the method of backdating of stock options and the subsequent certification of financial reporting documents not disclosing the backdating—were "fraudulent, illegal and *ultra vires* " such that they "cannot be ratified." The Pension Fund asserted "[d]emand for relief upon the Leggett Board would be (and has been futile) because the alleged wrongdoers constitute a majority of the Board, and thus, are incapable of impartially considering a demand." [5] Although the Pen-

sion fund did not plead a formal demand and subsequent rejection ·by the Board, it asserted in its petition that the Board "demonstrated its reluctance to consider such demand, for it has opposed this lawsuit and the relief sought for nearly two years" and· has "also refused to proceed with any claim for relief arising out of the backdating of options by [Leggett's] officers and directors." The Pension Fund essentially takes the position that the prior actions demanded in the prior lawsuits, ignored by the Board, were demands which were unmet.

Thereafter, the petition specifically stated the following ten reasons as to why "pre-filing demand upon the Board would be a useless and futile .act": (a) the Board has "demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations" and "they have developed professional relationships with, [those] with whom they have entangling financial alliances, interests and dependencies, and therefore, . . . are not able to and will not vigorously. prosecute any such action[ ]"; (b) the Board "approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Leggett's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties[ ]"; (c) the actions at issue "constitute violations of the fiduciary duties of loyalty owed by Leggett's officers and directors, bad faith acts, *ultra vires* acts and illegal acts, and are all incapable of ratification[ ]"; (d) the Individual Defendants "control approximately 7.6% of Leggett's voting stock[ ]"; (e) the Board members "have benefited, and will continue to

---

**5.** In support of its assertion that a "majority of [the Board] as of the lawsuit's filing knowingly received backdated stock options and/or engaged in backdating stock options, and all

approved false and misleading SEC filings[,]" the Pension Fund included a table in its petition relating to the tenure and role of each of the members of the Board.

benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control ... and are incapable of exercising independent objective judgment in deciding whether to bring this action[ ]"; (f) "[a]ny suit ... to remedy these wrongs would likely further expose their own liability under state or federal securities laws, ... thus, they are hopelessly conflicted in making any supposedly independent determination ... [ ]"; (g) Leggett "has been and will continue to be exposed to significant damages due to the wrongdoing complained of herein ... [ ]"; (h) any lawsuit would require the directors "to sue themselves and the other defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS penalties. This they will not do[ ]"; (i) based on changes to their insurance policy language, there would be "no directors' and officers' insurance protection and thus, ... they will not bring such a suit" against themselves; and (j) the Board would be "required to sue themselves and/or their fellow directors and allies in the top ranks of [Leggett]" for breach of fiduciary duty and "they would not do" so.

The petition then detailed various actions undertaken by the officers and directors that the Pension Fund asserted were illegal and *ultra vires* such as "deceptive conduct" in "backdating stock options and making false and misleading statements and omissions" in proxy statements, federal filings, and various reports; certain "significant accounting changes" made in relation to "stock-based compensation expense[s]" that were adopted by the Audit Committee, on which several of the Individual Defendants sat and which relied on methodology that had not been previously utilized in determining "compensation expense and report expenses and earnings in [Leggett's] consolidated financial statements"; the rejection of "the fair value recognition provisions" and methodology adopted by the Audit Committee that was to have been effective as of January 1, 2006; the Compensation Committee's failure to inquire into the accounting policy changes and the "outstanding option grants[,]" as well as the allegations of backdating; the "pattern and practice of ... breaches of the duty of loyalty, bad faith acts, ... violations of state law, [and] false statements[ ]"; violations of Article 5 of the Missouri Securities Act of 2003; and disregard for specific provisions of the adopted Bylaws of Leggett by taking actions outside of those permitted and delegated to them.

Further, the petition explained that demand upon the approximately 37,000 Leggett shareholders would be impossible for the Pension Fund as it had "no way of finding out the names, addresses or phone numbers of shareholders[,]" which was complicated by the fact that "25,000 beneficial owners for whom the Company's stock is held by a stockbroker in the name of a brokerage firm[,]" and "[m]aking demand on all shareholders would force [the Pension Fund] to incur huge expenses, assuming all shareholders could be individually identified." For the aforementioned reasons, the Pension Fund alleged in its petition that it was excused from making demand on the Board and the shareholders of Leggett per the requirements of Rule 52.09.

 Leggett and the Individual Defendants filed motions to dismiss the petition with all defendants adopting the motions to dismiss of the others. Collectively, the defendants raised four grounds for dismissal: (1) res judicata; (2) lack of standing resulting from a failure to comply with Rule 52.09; (3) statute of limitations; and (4) failure to state a claim.

Following a hearing, the trial court dismissed the petition without prejudice. Although the trial court gave no explanation as to the basis for its decision, it is apparent the dismissal was granted for failure to comply with Rule 52.09 because that was the only ground stated in the motions to dismiss that would warrant a dismissal without prejudice. This appeal followed.[6]

Although the Pension Fund presents four points relied on for our review—attacking each of the grounds for dismissal presented by the defendants—our resolution of the Pension Fund's first point is dispositive. As such, the critical issue presented is whether the trial court erred in finding the Pension Fund's petition did not adequately plead the futility of pre-filing demand such that it lacked "standing under Rule 52.09 to bring and pursue the underlying case. . . ."

## Standard of Review

This Court reviews a trial court's decision to grant a motion to dismiss under a *de novo* standard of review. *Ryann*

*Spencer Group, Inc. v. Assurance Co. of America,* 275 S.W.3d 284, 287 (Mo.App. E.D.2008). "When reviewing the dismissal, we examine the pleadings, allowing the broadest intendment, treating all alleged facts as true, and construing the allegations in favor of the pleader, to determine whether they involve principles of substantive law." *Id.* "A court reviews the petition 'in an almost academic manner, to determine if the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case.'" *City of Lake Saint Louis v. City of O'Fallon,* 324 S.W.3d 756, 759 (Mo. banc 2010) (quoting *Nazeri v. Mo. Valley Coll.,* 860 S.W.2d 303, 306 (Mo. banc 1993)). "In so doing, a court takes a plaintiff's averments as true and liberally grants plaintiff all reasonable inferences. It will not weigh the credibility or persuasiveness of facts alleged." *Id.* "In order to avoid dismissal, the petition must invoke 'substantive principles of law entitling plaintiff to relief and ultimate facts informing the defendant of that which plaintiff will attempt to establish at trial.'" *Coons v. Berry,* 304

---

6. The judgment in this matter was entered without prejudice. We note that although the general rule is that "a dismissal without prejudice is not a final judgment and, therefore, not appealable[,]" there are exceptions to this rule that apply to the present matter. *Doe v. Visionaire Corp.,* 13 S.W.3d 674, 676 (Mo. App. E.D.2000). As stated in *Doe,*

[a] dismissal without prejudice may operate to preclude a party from bringing another action for the same cause and may be res judicata of what the judgment actually decided. An appeal from a dismissal without prejudice can be taken where the dismissal has the practical effect of terminating the litigation in the form cast or in a plaintiff's chosen forum. When the effect of the order is to dismiss a plaintiff's action and not merely the pleading, then the dismissal is appealable. If the dismissal was such that refiling of the petition at that time would have been a futile act, then the order of dismissal is appealable. Applying these ex-

ceptions, dismissals without prejudice have been held appealable in such cases where the dismissal was based on statutes of limitations, theories of estoppel, a plaintiff's lack of standing, failure of the petition to state a claim where the plaintiff chose not to plead further. . . . A common factor of those dismissals without prejudice found appealable was that the plaintiffs could not maintain their actions in the court where the action was filed if the reason for the dismissal was proper.

*Id.* (internal citations omitted). "'In a case of a dismissal without prejudice, a plaintiff typically can cure the dismissal by filing another suit in the same court. . . .'" *Atkins v. Jester,* 309 S.W.3d 418, 423 (Mo.App. S.D. 2010) (quoting *Ampleman v. Schweiss,* 969 S.W.2d 862, 863–64 (Mo.App. E.D.1998)). As such, the present matter was a final appealable judgment and is properly before this Court.

S.W.3d 215, 217–18 (Mo.App. W.D.2009) (quoting *State ex rel. Henley v. Bickel*, 285 S.W.3d 327, 329–30 (Mo. banc 2009)). " 'In ruling on a motion to dismiss, the trial court can only consider the pleadings, and appellate review is also limited to the pleadings.' " *Atkins· v. Jester*, 309 S.W.3d 418, 422 (Mo.App. S.D.2010) (quoting *L.C. Dev. Co. v. Lincoln Cty.*, 26 S.W.3d 336, 339 (Mo.App. E.D.2000)).[7]

### Compliance with Rule 52.09

In its first point, the Pension Fund maintains the trial court's dismissal was in error in that it had standing under Rule 52.09 to "bring and pursue the underlying case ... [.]" The Pension Fund maintains its petition set forth sufficient facts to demonstrate the current petition alleged "new claims and facts not found in its prior petition ...," it was excused from making pre-filing demand upon the Board and the other shareholders as such actions would be futile and unnecessary, and it is able to "fairly and adequately represent the interests of other shareholders." We agree.

### Analysis

Rule 52.09 mandates that, in order for a shareholder to maintain a derivative action against and on behalf of a corporation, he or she must: (1) have been a shareholder at the time of the complained-of action;[8] (2) have served demand upon the board of directors and, if necessary, the shareholders as a whole; and (3) adequately represent the interests of all shareholders.

The second requirement of Rule 52.09 requires that if a stockholder brings a derivative action on behalf of the corporation, the stockholder must demonstrate "that he has exhausted all remedies and reasonable efforts within the corporation: that he has no other avenue of recovery." *McLeese v. J.C Nichols Co.*, 842 S.W.2d 115, 119 (Mo.App. W.D.1992). This amounts to a showing that the stockholder has made demand upon the board of directors to take action and, that effort failing, he has made similar demand upon the shareholders. *Saigh ex rel. Anheuser-Busch*, 396 S.W.2d 9, 17 (Mo.App.1965). There is an exception to this requirement if the shareholder shows " '*a state of facts from which it appears that such demand or effort within the corporation and through corporate channels would have been futile and unavailing.*' " *Id.* (emphasis in original) (quoting *Punch v. Hipolite Co.*, 340 Mo. 53, 100 S.W.2d 878, 885 (1936)). Thus,

> the complaining stockholder need not make these allegations in his petition if his petition alleges that the officers and directors of the corporation violated the trust committed to them by perpetrating and doing ultra vires, illegal[,] or fraudulent acts, because such acts cannot be ratified even by a majority of the stockholders. In such a situation equity will entertain an action for relief by a dissenting minority stockholder without first resorting or appealing to the stockholders as a body.

*Saigh*, 396 S.W.2d at 17. Conversely, if the alleged acts may be ratified by the

---

7. The dissent's reliance on *S.E.C. v. Shanahan*, 646 F.3d 536, 539–40 (8th Cir.2011), is misplaced and inappropriate here in that *S.E.C.* involved an action against an outside director for violation of securities laws and was not decided on the pleadings, but only after proof was introduced at a jury trial, not on the basis of the adequacy of the pleadings.

8. There are no contentions in the motions to dismiss filed by the defendants that the Pension Fund was not a shareholder at the time of this action. As such, we shall not explore that issue here.

body of stockholders, then they must be given the opportunity to do so or to take appropriate action before an individual shareholder has standing to bring a shareholder derivative action. *See Id.;* Rule 52.09.

With that being said, "[i]t is well-settled that to withstand a motion to dismiss a derivative action by a shareholder in a corporation, a plaintiff must allege 'with particularity' that he made demand on the Board of Directors to take remedial action on the corporation's behalf and, that failing, that plaintiff unsuccessfully sought action by the stockholders as a body." *McLeese,* 842 S.W.2d at 119 (quoting *Goodwin v. Goodwin,* 583 S.W.2d 559, 560–61 (Mo.App. E.D.1979)); *see also Wolgin v. Simon,* 722 F.2d 389, 392 (8th Cir.1983). If seeking to utilize the exception to the demand requirement, "[t]he plaintiff must state legally cognizable reasons for his failure to seek relief from the other stockholders." *McLeese,* 842 S.W.2d at 119; *see Saigh,* 396 S.W.2d at 21. "To meet this requirement, 'the plaintiff must allege a state of facts from which it appears that such efforts or demands would have been useless and unavailing.'" *Id.* (quoting *Goodwin,* 583 S.W.2d at 561).

 If we view the alleged facts as true, and construe those facts in favor of the pleader—the Pension Fund here—the pleadings in the petition appear to be adequate. As explained in *Bennett v. Mallinckrodt, Inc.,* 698 S.W.2d 854, 865 (Mo. App. E.D.1985):

Many allegations simply do not fall within a precise definition of a fact. They are mixed statements of fact and conclusions. In Missouri, however, we still remain stuck in a semantic morass, attempting to differentiate fine and evanescent distinctions between evidentiary facts, ultimate facts, and conclusions.

To us, the distinction is really one between generality and particularity.

. . . .

Rational application of our basic pleading principles can be used to classify plaintiffs' allegation of injuries either as ultimate facts or conclusions. Rather than torture logic to reach a preconceived result, we focus on whether [defendant] knows what this action involves. We think it does.

(Internal citations omitted). While the dissent is accurate that *Bennett* does not involve litigation in the context of a shareholder's derivative action, *Bennett's* stated principles requiring sufficient specific pleading are equally applicable here. In this case, the Pension Fund's petition devotes eleven pages and twenty-three paragraphs, with additional subparagraphs, in explaining why it was futile to make a presuit demand upon the officers and members of the Board prior to filing suit. While it is accurate that these allegations contain several legal conclusions, they also contain sufficient explanation, in the form of allegations, to apprise the parties as to the facts and claims at issue. Further, although some of the assertions are at times vague and indefinite, "[m]ere vagueness ... is not grounds for a motion to dismiss, ... and we prefer to dispose of a case on its merits instead of on the pleadings ... [.]" *Bennett,* 698 S.W.2d at 865 (internal citations omitted). The prerequisite is that the Pension Fund is required to *allege* with particularity that the actions complained of were fraudulent, illegal or ultra vires, not that it *prove* with particularity that those actions were in fact so. We express no opinion as to the propriety, or not, of the backdating as alleged. Whether the actions of Leggett's officers and directors fell within the purview of their business judgment or discretion is a matter for trial. *See Project, Inc. v. Prod.*

*Living Bd. For St. Louis Cty. Citizens With Developmental Disabilities*, 234 S.W.3d 597, 601 (Mo.App. E.D.2007) (holding that "[t]his Court does not endeavor to determine whether the alleged facts are credible or persuasive."). In applying our standard of review by examining the pleadings with the broadest intendment, treating the alleged facts as true, along with a query as to whether or not the defendants were apprised of the essence of the action, we reach the conclusion that the petition met the requirement of Rule 52.09 as it relates to making pre-suit demand. Whether the Pension Fund is able to prove all the necessary allegations is a matter for trial and not before this Court.

■■ Turning to the third requirement of Rule 52.09 that the Pension Fund is required to adequately represent the interests of all shareholders, we reach the same conclusion as above. While this issue is certainly not pled as diligently as that of the pre-filing demand assertions, the Pension Fund's petition does set out that it "will adequately and fairly represent the interests of Leggett and its shareholders in enforcing and prosecuting their rights." It then goes on to set out how the actions of the officers and directors have affected all shareholders and how those actions continue to cause damage. This is sufficient under our standard of review in that we treat the alleged facts as true and construe the averments in favor of the plaintiff. *City of Lake Saint Louis*, 324 S.W.3d at 759. The petition at issue complied with the pleading requirements of this State as it relates to the third element of Rule 52.09.

Based on the foregoing, this Court concludes the Pension Fund's petition adequately pled the futility of pre-filing demand such that it had "standing under Rule 52.09 to bring and pursue the under-

lying case...." The trial court erred in dismissing the petition. Point I has merit.

Based on our decision in Point I above, we need not address the Pension Fund's remaining points. They are moot and shall not be considered in our review.

Accordingly, the trial court's decision is reversed and remanded for further proceedings.

GARY W. LYNCH, P.J., dissents in separate opinion.

NANCY STEFFEN RAHMEYER, J., concur.

GARY W. LYNCH, P.J.

Regardless of whether the Pension Fund's allegations of demand futility upon the Board are sufficient, as addressed by the majority opinion, the allegations of demand futility upon the shareholders are not. I respectfully dissent and would affirm the trial court's judgment.

To begin with, the petition's allegations that shareholder demand would be burdensome do not support demand futility. While the majority opinion recites these allegations, it did not and could not rely on them to support shareholder demand futility for two reasons: the Pension Fund did not raise or mention this issue in its brief, and such a conclusion would be contrary to the holding in a case from the Eastern District of our court, *see Saigh ex rel. Anheuser–Busch, Inc. v. Busch*, 396 S.W.2d 9 (Mo.App.1965). By not mentioning these allegations in its brief, the issue was abandoned by the Pension Fund on appeal. *See Kline v. City of Kansas City*, 334 S.W.3d 632, 650 n. 3 (Mo.App.2011) (quoting *Jones v. Jones*, 296 S.W.3d 526, 528 n. 1 (Mo.App.2009) ("Issues ... that are unsupported by argument ... are deemed abandoned.")). In any event, the issue has no merit because "[t]he size of the corporation and the delay and expense

in circularizing stockholders widely scattered does not excuse the failure to seek action from the stockholders." *Saigh ex rel. Anheuser–Busch, Inc.*, 396 S.W.2d at 24.

Before addressing the grounds for shareholder demand futility actually raised in the Pension Fund's brief, the petition's allegations related to the challenged stock options must be put into proper perspective. The Pension Fund alleges the facts that statistical analysis of the stock options granted to the individual defendants during the relevant time period show a "1 in 1,000,000" chance that the option grant dates selected by Leggett were chosen randomly and that the bulk of the challenged grant dates coincided with periodic lows in the market price of Leggett's stock. Assumed as true, under our standard of review, these allegations are sufficient to support a reasonable inference that in-the-money stock options were granted to the individual defendants. *See S.E.C. v. Shanahan*, 646 F.3d 536, 541–42 (8th Cir.2011).

As explained in *S.E.C.:*

> A company whose common stock is registered with the SEC and publicly traded ... must disclose to shareholders and investors the compensation paid to its executives. One common form of compensation is the stock option, which grants a recipient the right to purchase a specified number of shares of the company's stock at a specified price, referred to as the "exercise" or "strike" price. When the market price of a publicly traded stock is equal to an option's exercise price, the option is said to be "at the money." When the market price exceeds the exercise price, the option is "in the money." If an option is "at the money" when granted, it will only enrich the recipient if the stock price rises in the future. But if the option is granted "in the money" and can be exercised immediately, it is to that extent equivalent to a cash bonus if the recipient is an employee. The grant of "in-the-money" options rewards favored employees without requiring cash outlays by the company. But it also affects investors because it dilutes the position of shareholders when the option is exercised.

*Id.* at 539–40.

A related employee compensation practice, sometimes referred to as "backdating," occurs by setting a grant date in a stock option that precedes the date the decision is made to award it, presumably when the stock price was lower on the grant date than on the decision date. *Id.* at 540. This results in the award of immediate in-the-money compensation to the employee recipient. *Id.* This practice "is not itself illegal under the securities laws[1]

---

1. I disagree with the biased definition used by the majority that "[b]ackdating occurs when [a stock] option's grant date is altered to an earlier date with a lower, more favorable price to the recipient." Slip. op. p. 4, n. 4 (quoting *In re CNET Networks, Inc.*, 483 F.Supp.2d 947, 950 (N.D.Cal.2007)). The explanation of this definition from *In re Zoran Corp.*, also relied upon in the majority opinion, is also biased in that it not only assumes that a grant date cannot precede the decision date, like the definition from *CNET*, but also that stock options with a grant date preceding the decision date are always accompanied by a failure to properly account for the corresponding compensation expense. Both of these propositions, authored by a lone district court judge, William Alsup, sitting as the trial judge in both *CNET* and *Zoran*, are squarely rejected by the 8th Circuit Court of Appeals in *S.E.C.* The majority opinion's reliance upon Judge Alsup's definitional assumptions and use of biased language, such as "grant date is altered," "pretend that the grant," "real date," "phony grant date," "pretend no need exists to recognize an expense," "true grant date," "underreporting its compensation expenses," and "proper grant date," preordain its acceptance of and reliance upon concluso-

[1], nor is it improper under accounting principles[2]." *Id.* (quoting *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 788 (11th Cir.2010)).

In its brief, the Pension Fund raises two grounds supporting shareholder demand futility based upon the allegations in its petition. First, the grant of in-the-money stock options to the Individual Defendants could not be ratified by the shareholders because they were *ultra vires* acts, in that they were prohibited by the shareholder adopted stock option plan. Second, the shareholders could not ratify Leggett's financial statements issued for the time periods during which in-the-money stock options were granted to the Individual Defendants because those financial statements were illegal, in that they misrepresented Leggett's financial position due to such grants. Neither ground has any merit.

First, the Pension Fund argues that the grant of in-the-money stock options constitutes *ultra vires* acts, i.e., acts that are beyond "the scope of the power allowed by [the Corporation's] charter or statute." *Wolgin v. Simon*, 722 F.2d 389, 393 (8th Cir.1983). Notwithstanding that the stock option plan is not part of Leggett's charter or mandated by statute, the Pension Fund points to the provisions of Leggett's shareholder-adopted stock option plan to support its claim that the plan prohibits the grant of such options. That language is essentially the same as that found in the plan in *S.E.C.* There, the option plan stated that "[t]he option price of shares subject to any Stock Option shall be the closing price of the Stock on the date that the Stock Option is *granted* [,]" *S.E.C.*, 646 F.3d at 540 (emphasis added); here, the stock option plan states that the "purchase price ... shall be no less than the Fair Market Value of the Shares at the time the Option is *granted.*" (Emphasis added.) The Eighth Circuit has expressly determined that a stock option with a *grant* date before the decision date complied with this language and was not prohibited by the plan. *Id.* at 540. While I find *S.E.C.* persuasive on this issue, even if I did not, it cannot be said that it is an unreasonable interpretation of the plan's language. This reasonable view of the plan's language, which is contrary to the Pension Fund's prohibitory interpretation of that language, means that, from the Pension Fund's perspective, the plan's language is, at best, ambiguous as to whether an option's grant date may precede its decision date. The Pension Fund directs us to no authority, and I can find none, that would foreclose the body of Leggett shareholders from resolving such an ambiguity in its own stock option plan by considering whether to ratify the grant of these stock options.

"[C]ompensation and other privileges which officers and directors of corporations receive are matters [that] can be ratified by the shareholders, and any complaint about these matters must be

---

ry allegations of illegal and fraudulent actions on the part of the Individual Defendants in the absence of any alleged ultimate facts supporting those conclusions.

2. According to Generally Accepted Accounting Principles Board Opinion No. 25 ("APB 25"), however, "backdated options must be recorded as a compensation expense to the corporation because they effectively give recipients immediate compensation.... A cor-

poration that fails to follow APB 25 and record backdated options as a compensation expense will necessarily misstate its expenses and income in its financial reports." *S.E.C,* 646 F.3d at 540 (quoting *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,* 594 F.3d 783, 788 (11th Cir.2010)). Here, the Pension Fund did not allege or attempt to show in its latest petition that Leggett failed to follow APB 25.

brought to the attention of the shareholders for their action before a suit can be brought." *Wolgin,* 722 F.2d at 393. Thus, even if the alleged actions arguably fell outside the scope of Leggett's stock option plan under the Pension Fund's interpretation of the plan's language, because the underlying issue involves the resolution of ambiguous plan language related to executive compensation, it is within the purview of the shareholders to ratify the actions of its board of directors and officers. That issue should have been presented to Leggett's body of stockholders.

The Pension Fund's second argument—Leggett's financial statements were illegal in that they misrepresented Leggett's financial position due to the challenged stock options—also fails. To succeed on this argument, the Pension Fund was obligated to allege facts that, if true, show the resulting financial statements rise to the level of misrepresenting Leggett's financial position. This it has failed to do. No allegation in the Pension Fund's petition points to any particular content in any financial statement that is alleged to be inaccurate or a misrepresentation. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 55.15. Moreover, averments of demand futility in a derivative action such as this must be pleaded with particularity. Rule 52.09.

Here, however, the Pension Fund relies only upon repeated conclusory allegations that on each of the challenged decision dates, Leggett and Individual Defendants engaged in illegal backdating of stock options and thus necessarily filed misleading and false financial statements.[3] These legal conclusions are not supported by any particular factual assertions related to any financial statement but are merely circular arguments relying upon the fallacy that the backdating of stock options is by definition and under all circumstances illegal, which it is not. *See S.E.C.,* 646 F.3d at 540.

In conclusion, it is important to note the issues that are not addressed or decided in this appeal: whether any alleged backdating occurred; whether in-the-money stock options were issued or, if they were, whether they were issued in accordance with the stock option plan or whether, if given the opportunity to do so, the Leggett shareholders would ratify those grants; or whether Leggett's financial statements were misleading. Rather, the dispositive issue to be decided in this appeal is whether the Pension Fund pleaded *with particularity* sufficient facts to relieve it of the obligation to make demand upon Leggett's shareholders as required by Rule 52.09.

For the above reasons, I conclude that the Pension Fund has failed to show with particularity through its allegations in its

---

**3.** The majority opinion's repeated references to the quantity of allegations in the Pension Fund's petition are no substitute for an analysis of the quality of those allegations. The mere repetition of a legal conclusion does not transmute it into an allegation of an ultimate fact. The majority opinion's reliance upon *Bennett v. Mallinckrodt, Inc.,* 698 S.W.2d 854, 865 (Mo.App.1985), to ignore or relax the particularity requirements of Rules 52.09 and 55.15 is misplaced. The narrow issue in *Bennett* was whether plaintiffs' allegations of "various health and physical" illnesses or "injury" generally are ultimate facts or conclusions. *Bennett,* 698 S.W.2d at 865. The court there characterized the distinction as "really one between generality and particularity[,]" opting for the former rather than the latter in reversing the dismissal of the petition. *Id.* The *Bennett* court, however, was not operating under the particularity constraints of Rules 52.09 and 55.15, as are we in the case before us. The majority opinion's reliance upon *Bennett* to gloss over the deficiencies in Pension Fund's petition effectively eliminates the particularity requirement in both rules.

latest petition that serving demand on Leggett's body of shareholders would have been a futile act. Thus, in the absence of an allegation that demand was made upon the body of shareholders, the Pension Fund has not met the requirements of Rule 52.09 and had no standing to bring this derivative action. I would affirm the trial court's judgment dismissing the petition.